[No. H033425. Sixth Dist. Nov. 30, 2010.]

SHERRY DANG, Plaintiff and Appellant, v.
ALAN SMITH et al., Defendants and Respondents.

**COUNSEL**

Law Firm of Kallis & Associates and M. Jeffery Kallis for Plaintiff and Appellant.

Roeca Haas Hager, Russell S. Roeca and Edward Haas for Defendants and Respondents.

## Opinion

**RUSHING, P. J.**—Plaintiff Sherry Dang brought this action for legal malpractice against her former attorneys, defendants Alan Smith and Dennis P. Howell, and their firm, Grunsky, Ebey, Farrar & Howell, that had represented plaintiff in obtaining and attempting to collect a judgment against two men who purchased a bakery business from her and then defaulted. As initially framed, her complaint was largely predicated on defendants' failure to record a judgment lien against real property in which one of the judgment debtors held an interest as a joint tenant. Defendants moved for summary judgment on evidence establishing that they had in fact recorded a lien, but that it had been extinguished when the debtor joint tenant died. In opposition to the motion, plaintiff offered three new theories of liability, of which only one resembled anything alleged in the original complaint. Plaintiff made no attempt to demonstrate, by proposed pleading, declarations, or otherwise, that she could truthfully plead, let alone prove, the elements of a cause of action on any of the three theories. She at no time moved, or even asked the court, for leave to amend her complaint. She offered no proposed amended pleading. She nonetheless contends on appeal that the trial court erred by failing to grant leave to amend. We reject this contention, not only because it is procedurally insupportable but because none of the proposed new theories appears to be substantively viable. Accordingly, we will affirm the judgment.

### Background

#### A. Events Prior to Suit

In 1995 plaintiff purchased the Mity Nice Bakery in Santa Cruz. In doing so she assumed an outstanding note for $180,000 in favor of a previous owner, one Odzak.

The business lost money at the rate of about $10,000 to $12,000 a month. In 1999 plaintiff decided, not surprisingly, to sell the bakery.[1] She listed it with a broker and advertised in a newspaper. Apart from the inquiry resulting in its eventual sale, she received only one serious expression of interest—from the bakery's then manager, who lacked the money to purchase it.

---

[1] In many of the transactions here described, plaintiff was joined by her husband, Phillip Dang. He is not a party to this action, however, and his involvement appears irrelevant to any issue presented on appeal. We therefore omit further reference to him and speak as though plaintiff at all times acted alone.

In early 2000, plaintiff agreed to sell the property to a former manager, Thomas Deaton, and his partner, Robert Probst.[2] The agreement was reflected in a written contract of sale dated January 25, 2000. It called for the buyers to furnish a $1,000 deposit, give plaintiff a note for about $51,000, and assume two obligations including the Odzak note. Although both Deaton and Probst were married, neither of their spouses signed the agreement. Escrow was handled by Reid Schantz, a licensed attorney.[3] Plaintiff asserted—but neither alleged nor offered evidence to show—that she had "retained" Schantz "to broker the sale." The agreement itself recited that Schantz had drafted it "consistent with the instructions from Buyer and is solely representing the buyer in the negotiation portion of this transaction."

The buyers soon defaulted on their obligations. In August 2000, Odzak brought an action against plaintiff. In November, plaintiff retained defendants to represent her. They brought a cross-action on plaintiff's behalf against the buyers. The parties agreed to settle the cross-action by stipulating to a $314,900 judgment for plaintiff. Although the buyers' spouses had not been joined in the action, the settlement called for them to join in the stipulation, thereby subjecting themselves to the judgment. Deaton's wife signed the stipulation and was named in the judgment. But Probst's wife, Deysi Probst, refused to sign. Her name was stricken from the judgment as entered.

Defendants then undertook to collect on the judgment. On September 11, 2001—the day the judgment was entered—they recorded an abstract of judgment in Santa Cruz County. This had the effect of attaching a judgment lien onto all interests held by Robert Probst in any real property anywhere in the county. (Code Civ. Proc., §§ 697.310, subd. (a), 697.340; Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2010) ¶¶ 6:173, 6:175, pp. 6B-8, 6B-9 (rev. # 1, 2010) (Ahart).) Apparently the only such interest was title in a Watsonville house held by himself and his wife under a deed dated December 22, 2000, describing the grantees as "husband and wife as joint tenants."

On May 23, 2003, Robert Probst had a fatal heart attack at age 39. As discussed below, this had the effect of automatically vesting title to the entire property in Deysi Probst free of any encumbrances that had been attached

---

[2] According to plaintiff's deposition testimony, the sale was part of the resolution of a lawsuit she had brought against Deaton and Probst based on allegations that Deaton had misappropriated recipes from Mity Nice and used them in a bakery apparently operated by Deaton and Probst. She also testified to having heard that while in her employ, Deaton sold "finished product" at half price, presumably for his own account, to Probst, who ran a catering business.

[3] Plaintiffs spell this surname "Shantz" throughout the record and briefs. Online State Bar records show only one attorney in California with that surname; his given name is not Reid, and he had not been admitted to the bar when the events described here took place.

only to Robert Probst's interest. Thus when Deysi Probst recorded an affidavit of death of joint tenant on August 3, 2003, she established prima facie record title in herself, free of plaintiff's judgment lien.

On June 19, 2003, Mrs. Probst filed a bankruptcy petition. It and a second petition were dismissed. A third, however, resulted in a final decree on November 16, 2004. Defendants assert, and plaintiff does not dispute, that the decree "discharged Mrs. Probst from any personal liability she might have had for the Dang judgment." Since the Deatons had already received similar relief in bankruptcy, this event seems, at least in retrospect, to have barred the last avenue by which plaintiff might have obtained any further satisfaction of her judgment.

It appears that defendants labored for some time under the misapprehension that plaintiff's judgment lien had survived the death of Robert Probst. Thus Smith wrote to plaintiff on the day after Mrs. Probst's bankruptcy decree, stating that he had requested notice of other encumbrances or actions against the property and anticipated its eventual sale in foreclosure. On February 11, 2005, he wrote again recommending that she attend a foreclosure sale, then scheduled for March, and purchase the property. This advice of course assumed that she still had an encumbrance on the property, when in fact—as defendants now concede—her encumbrance had been extinguished. Smith still seemed to be under this impression when, on May 2, 2005, he wrote to plaintiff advising her that a foreclosure sale was to take place in about three weeks and that he planned to be there, with her, "to answer any questions you may have during the sale."

Meanwhile plaintiff apparently undertook to secure financing for a bid on the property. On or about May 5, she received a preliminary title report indicating that title was held in fee by "Deysi Probst, surviving joint tenant." The report stated that the only recorded "conveyance of the land within [the past 24] months," was the "Affidavit—Death of Joint Tenant (by Surviving Spouse)" recorded by Deysi Probst on August 3, 2003. Smith declared that after receiving a copy of this report he "phoned the title officer to inquire why the Dang judgment did not show up as an exception to title." The title officer explained that "since the property was held in joint tenancy with right of survivorship, First American Title was willing to insure that the lien only attached to Robert Probst's share of the property. When Mr. Probst died the title company was also willing to insure that he had no further interest in the property and there was nothing for the judgment lien to attach. The title

officer cited legal authority, which I researched and found to reasonably support First American Title's position."[4]

On June 6, plaintiff and defendants held a meeting memorialized three days later in a letter by Smith. He wrote that the judgment lien had been listed by Mrs. Probst in bankruptcy filings and by title insurers in earlier preliminary reports, and that defendants had "pursued that security interest." The situation had now changed, he wrote, in that "First American is willing to insure title to a buyer free and clear of your judgment lien." He advised her against any further attempt to pursue collection from Mrs. Probst. Among the reasons cited was that in order to prevail, plaintiff would "need to carve out an exception in the law for your unique circumstances," an endeavor which, in his opinion, "would not be successful." Smith then observed that plaintiff had recovered some of her losses through other collection efforts and by taking a "tax bad debt write off." He concluded by suggesting that the lack of a better result was attributable to the failure to include the purchasers' wives as cosigners on the original purchase agreement.

### B. *Proceedings*

Plaintiff filed a verified complaint on May 26, 2006, asserting causes of action for legal malpractice, breach of fiduciary duty, misrepresentation, breach of contract, intentional infliction of emotional distress, and "conspiracy." In the complaint she alleged on her own knowledge and under penalty of perjury various matters that she could not actually know of her own knowledge, some of which proved to be contrary to fact. (See Code Civ. Proc., § 446, subd. (a) [by verifying pleading, party certifies "that the same is true *of his own knowledge*, except as to the matters which are therein stated on his or her information or belief . . . ."].) These included repeated allegations that no lien "was ever recorded" by defendants "against the real property of the Purchasers." She further alleged that the only security interest defendants created in her favor was "a personal property lien filed with the Secretary of State." She specifically alleged that "[d]efendants did not record a lien or Abstract of Judgment against the Probst real property located in Santa Cruz County . . . ." However she also alluded to defendants' "failure to secure the judgment by lien against the Probst property," their "failure to fully secure the judgment," and "the loss of her lien on the Probst property."

---

[4] This seems a very roundabout way of acknowledging—or avoiding an acknowledgment—that Smith only learned of the governing rule of law, and the effect of Robert Probst's death on the judgment lien, when the title officer told him about it. It is from this seed, nourished no doubt by defendants' lack of forthrightness when the oversight was discovered, that the present suit has grown. It bears noting, however, that plaintiff's present counsel seems to have been similarly ignorant of the applicable principles when he concluded, as he apparently did, that no judgment lien had ever arisen in the first place. This record leaves an impression that plaintiff has not been well served by the legal profession in any of the three engagements reflected here.

Defendants moved for summary judgment or, in the alternative, summary adjudication of specific causes of action. Their primary contentions were that (1) judicially noticeable public records conclusively refuted plaintiff's allegation that defendants never recorded a lien against the Probst house; and (2) they did not misadvise plaintiff in saying there was no way to satisfy her judgment against the Probst house. Defendants acknowledged that whatever interest they had secured by recording the abstract of judgment was "extinguished" when Mr. Probst died, but they asserted that when this occurred they were "taking steps to collect the judgment, including bringing Mrs. Deysi Probst into the case."

In opposition to the motion, plaintiff conceded that her professional negligence claim could not be maintained "under the theory of the complaint." However, she contended, defendants' motion "contain[ed] the seeds of [its] own destruction" because it supported a finding that defendants had negligently permitted Mr. Probst's interest in the property to be extinguished by his death. Plaintiff declared that defendants took no steps to avert such an event and never advised her of the risk that it might happen. Further, plaintiff asserted, defendants' conduct could be found to constitute professional negligence in two additional respects: their advice concerning the advisability of suing plaintiff's previous attorney, Reid Schantz, for failing to join the purchasers' wives in the purchase agreement; and their failure to advise that "no contract was ever formed" because of the failure of a condition precedent.[5]

In reply, defendants argued that plaintiff was "attempt[ing] to create a new and different case than the one alleged in her verified complaint, [one] which is contrary to those allegations and [to] her sworn testimony in deposition and respon[ses] to interrogatories." They cited authorities concerning the prohibition against contradicting the allegations of one's own pleadings, the effect of judicial admissions, and the consequences for perjury, as well as the role of pleadings in framing the issues on summary judgment. They further contended that plaintiff's new theories of negligence were not colorable. The failure to prevent extinction of the lien was not actionable, they argued, because they could not be expected to foresee the death of plaintiff's judgment debtor: "An attorney is not obligated to guess every eventuality that might occur, only those that are reasonable."[6]

---

[5] Plaintiff also argued that triable issues of fact were presented by her claims for fraud, intentional infliction of emotional distress, and breach of contract. Since she makes no attempt to defend any of these theories on appeal, we will not discuss them further.

[6] Perhaps so, but an attorney *is* under a duty, the limits of which are determined by the applicable standard of care, to anticipate risks arising from a given legal strategy and to take steps to minimize them, or at least to advise the client of them when they may affect her choices in the matter. Whether the standard of care requires an attorney representing a

At the hearing on the motion for summary judgment, the court stated the pivotal issue as "whether or not the defendants are entitled to rely on the allegations in the Complaint, and in particular a verified Complaint in this case when moving for summary judgment and in the alternative summary adjudication as to these various causes of action." The court said that its "tentative ruling" was "to grant the summary judgment in this particular case based on the case law in this particular area because the pleadings serve as the outer measure of materiality on a motion for summary judgment and the motion may not be denied on issues not raised by the pleadings."

Plaintiff's attorney responded that his client had adequately pled defendants' failures to disclose, and misrepresentations concerning, the status of the lien. He concluded, "[T]he issue of malpractice merely requires that the plaintiff show that there was a situation in which the attorney's conduct fell beneath a certain standard. We have pled the conduct and the standard, which is fairly straightforward, is a client must be fully and accurately informed."

The court adopted its tentative ruling granting the motion for summary judgment.

## DISCUSSION

### I. *Appellate Jurisdiction*

The trial court entered three distinct "judgments" in this case. On October 3, 2007, the court signed a "judgment for defendants on complaint." It recited that the court had granted defendants' motion for summary judgment and that "[t]herefore . . . judgment [is] entered in favor of Defendants . . . and against Plaintiff . . . ." On December 11, 2007, the court entered an amended judgment awarding defendants some $59,000 in costs and attorney fees against plaintiff.

This would of course have been a final appealable judgment if not for the fact that defendants had filed a cross-action seeking, apparently, unpaid fees. Few of the pleadings from that matter appear in this record, but apparently it remained unresolved until it was settled on the eve of trial. On September 9, 2008, the court entered a third judgment reciting that judgment was entered

---

judgment creditor to advise his client of the inherent vulnerability of a judgment lien attached only to the interest of a single joint tenant is a question neither party has addressed and we need not decide. But we do note the following "Practice Pointer" in a treatise on the subject: "The judgment creditor may wish to avoid the expense of levy and sale under writ of execution ([cross-reference]) and further proceedings to partition the property. But it is risky to sit back and wait for joint tenancy property to be sold or refinanced. Inaction may result in loss of the judgment lien on death of the judgment debtor. *Be sure to advise joint tenant judgment creditors of the risk involved!*" (Ahart, *supra*, ¶ 6:169, p. 6B-7 (rev. # 1, 2010), italics added.)

"[p]ursuant to the settlement" in favor of cross-complainants for $4,500, subject to certain other terms of the settlement. The judgment included this recital: "Nothing contained in this judgment, nor the resolution of this Cross-Action shall be deemed to waive Cross-Defendant Sherry Dang's rights to appeal from the judgment entered on the Complaint against her and in favor of the defendants." Notice of entry of this judgment was given on September 12, 2008.

On September 30, 2008, plaintiff filed a notice of appeal on a Judicial Council form. It states that the appeal is taken "from the following judgment or order in this case, which was entered on (*date*): 9-14-2008." Beneath this a box is checked signifying that the judgment or order appealed from is a "[j]udgment after an order granting a summary judgment motion."

Defendants assert that the notice of appeal failed to confer appellate jurisdiction over the trial court's ruling on summary judgment because the notice of appeal "states she is appealing from the judgment entered on '9-14-2008,' which is the filing date of the stipulated judgment on the attorneys' cross-complaint."[7] "As such," defendants continue, "it is too late for her to appeal from the amended judgment, entered December 11, 2007, following Respondents' summary judgment."

■ This argument is bewildering. It seems to assume that the "judgment" following the ruling on summary judgment was separately appealable, so that plaintiff is now barred from challenging that ruling. No attempt is made to substantiate this premise, presumably because it is flatly contrary to law. The general rule is that no appeal will lie from a "purported final judgment . . . rendered on a complaint *without adjudicating the issues raised by a cross-complaint*." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 117, p. 180, italics added.) The judgment of September 2007, and the amended judgment that followed it, were just such "purported final judgment[s]." No appeal would or could lie from either of them. The first and only appealable judgment in the case is the one entered on September 9, 2009. Plaintiff's notice of appeal misstated the date of entry as September 14, but this misdescription is inconsequential. ■ It is a rule both ancient and sound that "[n]otices of appeal are not strictly construed, and an appeal will not be dismissed because of a misdescription of the judgment or order to which it relates unless it appears that the respondent has been misled by such misdescription." (*Title Guarantee & Trust Co. v. Lester* (1932) 216 Cal. 372, 374 [14 P.2d 297] [erroneous date in notice of appeal did not require dismissal where appealed order adequately described in terms of substance];

---

[7] In fact the judgment was entered (filed) on September 9. The notice of its entry was filed on September 12. Neither the record nor the superior court's Web site suggests that any relevant occurrence took place on September 14.

see *Holden v. California Emp. etc. Com.* (1950) 101 Cal.App.2d 427, 431 [225 P.2d 634]; *Sherman v. Rolberg* (1858) 9 Cal. 17, 18; *Judd v. Superior Court of Humboldt County* (1916) 29 Cal.App. 671, 674 [157 P. 566].) The record suggests no basis on which to withhold this rule here. There is no other judicial act at or near the time referred to in the notice of appeal. Indeed defendants have joined plaintiff in misstating the date of entry as "9-14-08." Nor could defendants have been misled by plaintiff's description of the judgment as one "after an order granting a summary judgment motion." So far as this appeal is concerned, that description is perfectly accurate.

This court has jurisdiction over the appeal.

## II. *Merits*

### A. *Failure to Perfect Lien*

Plaintiff concedes that insofar as her complaint was predicated on defendants' supposed failure to *create* a lien in the Probst property, it cannot be sustained because defendants did in fact seasonably cause a judgment lien to attach to that property. Plaintiff contends, however, that she should be permitted to pursue a legal malpractice claim on the theory that defendants negligently failed to *perfect* the lien, or to advise her of the potential risks of a failure to do so. This contention furnishes no basis to reverse the order under review, because plaintiff neither pleaded nor offered to prove facts sufficient to make out a viable case on this new theory.

Both sides address the viability of plaintiff's new theory as if it were determined solely by rules relating to pleadings. Defendants contend that it is barred by her original verified allegation that they had failed to *record* a lien on the Probst house—an assertion repeated several times in discovery under penalty of perjury. Defendants characterize these statements as "judicial admissions" from which plaintiff's new theory would mark an impermissible departure. She is "bound" by them, say defendants, and "cannot switch her facts and contentions to avoid summary judgment."

We cannot accept this application of the principles governing judicial admissions. Certainly statements in a pleading are always admissible against the pleader to prove the matter asserted—as is any other statement by a party. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 97, p. 799.) What distinguishes such statements is that they are not merely *evidence* of the matter stated, but operate as "a *conclusive concession of the truth* of [that] matter," thereby "removing it from the issues." (*Ibid.*, italics added.) In other words, a pleaded fact is *conclusively deemed true* as against the pleader.

But this is not the use defendants seek to make of plaintiff's allegation that they failed to record a lien against the Probst house. On the contrary, they

themselves have conclusively demonstrated the *falsity* of that allegation—a point plaintiff now acknowledges, admits, and concedes. Defendants thus rely on the allegation not to conclusively establish its truth, but to preclude plaintiff from *modifying or amending* her claim to conform to the true facts now disclosed, i.e., that although defendants indeed recorded a lien, they did not prevent its being extinguished by the death of the judgment debtor.

■ The only effect of an earlier allegation in such a context is to prevent the pleader from *amending her pleading* so as to *contradict* the judicially admitted matter. (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1198, p. 630.) Because the original allegation is conclusively deemed true, the pleader is not permitted to assert its *logical opposite*. But this rule has no application here, for plaintiff cannot be properly understood as seeking to "contradict" her original allegation that defendants failed to record a lien. She does seek to abandon that allegation, in favor of a broader one effectively substituting the word "perfect" for the word "record," but defendants greatly exaggerate the nature and extent of this modification. They would have us view this single imprudent allegation in isolation, but plaintiff alluded elsewhere in her complaint to a state of facts consistent with those disclosed by the proofs on summary judgment. Thus she referred to "the *loss of her lien* on the Probst property" and defendants' "failure to *fully secure* the judgment." (Italics added.) She alleged that defendants told her they "had *properly secured* [*her*] *financial interests* in the [Probst] property and had filed the *necessary and proper* personal and real property liens to *protect the Plaintiff.*" (Italics added.) This is a roughly accurate description of the duty they allegedly violated under her new theory. She alleged that defendants attempted to conceal their "failure to *secure the judgment* by lien against the Probst property," again a broader and more accurate depiction of the facts than the one to which defendants would tie her. (Italics added.)

Given these circumstances, we do not believe plaintiff's new theory rests on allegations that "contradict" her original complaint. It is true that as a purely logical matter, a lien that never existed (as plaintiff originally alleged) cannot be extinguished or otherwise lost (as actually occurred). But that is a mechanical logic without legal significance. The gist of the claim, under either premise, is that plaintiff was deprived of a valuable property right due to the alleged negligence of defendants.

It was unquestionably imprudent of plaintiff to allege that no lien was *recorded*, particularly as the contrary was presumably a matter of public record. And there is no doubt that a pleading as careless as this should be discouraged, particularly when the allegations are made under penalty of perjury. But we decline to rely on these principles as a basis for affirming the judgment before us, particularly when doing so would only threaten to burden

the courts with yet another malpractice suit, and when it appears that plaintiff's new theory is fatally flawed on the merits.[8]

So far as can be discerned from plaintiff's brief, the gist of the proposed theory is that defendants breached the professional standard of care by failing to adequately protect, or advise her of the need to protect, her judgment lien from being extinguished should Robert Probst die before the lien was discharged. She also alludes to the possibility that had defendants adequately understood the vulnerability to which her lien was exposed, they could have "foreclos[ed] on" it or "negotiat[ed] with the Probsts to re-structure title to their home to protect [her] interests." This is apparently what she means by stating that defendants failed to "act upon Robert Probst's joint tenancy interest." In the trial court plaintiff's counsel wrote that defendants failed to "act[] to preserve her judgment lien."

This theory could not furnish a basis for denying summary judgment because, on the present record, there is no basis to suppose that defendants' alleged negligence could be shown to have proximately caused the loss of the lien. Plaintiff has made no attempt to show, and it does not otherwise appear, that there was anything defendants could have done that would have "pre-serve[d] her judgment lien." To understand why this is so, it is necessary to review the legal principles that led to the loss of the lien, and those that tended to make this result inevitable should Robert Probst die, as he ultimately did.

■ When a judgment debtor holds property in joint tenancy, the recordation of a judgment lien will encumber the property *only to the extent of the debtor's interest.* (Ahart, *supra*, ¶ 6:167, p. 6B-7 (rev. # 1, 2010).) This is an application of the more general rule that an encumbrance against property held in undivided interests—whether a joint tenancy or a tenancy in common—attaches only to the interest of the tenant whose obligation the encumbrance secures. (*Caito v. United California Bank* (1978) 20 Cal.3d 694, 701 [144 Cal.Rptr. 751, 576 P.2d 466]; *Haster v. Blair* (1940) 41 Cal.App.2d 896, 898 [107 P.2d 933].) The possibility of the debtor's death poses no particular hazard to the creditor of a tenant in common, for it will not impair the encumbered interest; that interest will pass into the debtor's estate, and be

---

[8] Similarly, we note that the law recognizes the right of a pleader to contradict a previous judicial admission by amending the pleading, provided the request to do so is supported by a "showing . . . of mistake or other excuse for changing the allegations of fact." (5 Witkin, *supra*, Pleading, § 1198, p. 630.) Here it seems extremely unlikely that plaintiff's original allegation was the product of anything other than mistake, however inexcusable. It is true that plaintiff never asked or offered to amend her complaint to allege the facts on which she now seeks to rely. Again, however, to rest our judgment solely on that ground would seem to invite another malpractice suit, and we think it best serves the interests of all parties to address the claim on the merits to the extent the present record permits.

available to satisfy his debts. But the distinguishing characteristic of a joint tenancy is that each tenant has a *right of survivorship*, by which, upon the death of the other tenant, the survivor will automatically succeed to the entire property. (*Estate of Propst* (1990) 50 Cal.3d 448, 452, 455 [268 Cal.Rptr. 114, 788 P.2d 628]; *Grothe v. Cortlandt Corp.* (1992) 11 Cal.App.4th 1313, 1317 [15 Cal.Rptr.2d 38].) In effect, the decedent's title is extinguished, and with it any interest to which his judgment creditor's lien had attached. The result is that the lien ceases to encumber the property, and the survivor succeeds to the whole property "free and clear of the judgment lien." (Ahart, *supra*, ¶ 6:167, p. 6B-7 (rev. # 1, 2010); see 5 Miller & Starr, Cal. Real Estate (3d ed. 2006) § 12:31, p. 12-79 (rev. 8/2006) ["A lien that is secured only by the separate interest of one joint tenant expires and is extinguished on the death of the debtor/joint tenant, and the surviving joint tenant holds the title free of the lien."].)

■ A creditor may sometimes avert this risk by causing the joint tenancy to be *severed* before the debtor dies. (See 1 Goldsmith et al., Cal. Debt Collection and Enforcement of Judgments (2006) § 11.11[5][a], pp. 11-23 to 11-24 (rel. 5-9/2008); 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 55, p. 106.) This strips away the right of survivorship by converting the joint tenancy into another form of ownership—typically tenancy in common. (*Re v. Re* (1995) 39 Cal.App.4th 91, 95–96 [46 Cal.Rptr.2d 62]; *Estate of Gebert* (1979) 95 Cal.App.3d 370, 376 [157 Cal.Rptr. 46].) But California courts have consistently held that the attachment of a judgment lien, without more, does not effect a severance; to do that, the creditor must *sell* the property under a writ of execution. (*Grothe v. Cortlandt Corp., supra*, 11 Cal.App.4th at p. 1322; *Hammond v. McArthur* (1947) 30 Cal.2d 512, 515 [183 P.2d 1]; *Estate of Layton* (1996) 44 Cal.App.4th 1337, 1340 [52 Cal.Rptr.2d 251]; see 12 Witkin, *supra*, Real Property, § 55, p. 106.)

■ Under these well-settled principles, the only way to protect plaintiff's lien against the death of Robert Probst would have been to *successfully execute on his interest* before that event occurred. It appears extremely unlikely that defendants could have achieved this, and given that fact—and the great expense the attempt would have entailed—it appears even less likely that plaintiff would have authorized them to try. The reasons for this stem in part from the apparent fact that the property in question was a "[d]welling" for purposes of the statutes governing the execution of judgments. (Code Civ. Proc., § 704.710, subd. (a).) Where such a property is concerned, "due to the minimum bid requirements [citation], *it is very difficult, if not impossible, for a debtor's home actually to be sold at an execution sale*." (Ahart, *supra*, ¶ 6:757, p. 6D-96.2 (rev. # 1, 2010), italics added.) Where a dwelling is owned in common with a nondebtor, the difficulties of execution are compounded by two factors. First, only the

debtor's interest is subject to execution. (Code Civ. Proc., § 704.820, subd. (a); *Schoenfeld v. Norberg* (1970) 11 Cal.App.3d 755, 765, fn. 6 [90 Cal.Rptr. 47].) Second, it can be sold at execution only if its appraised value exceeds the value of any homestead exemption plus the *total* value of *joint* encumbrances *on the entire property.* (*Schoenfeld, supra,* 11 Cal.App.3d at pp. 765–766.) This of course places "severe limitations . . . on the situations in which a sale of property held in cotenancy between the judgment debtor-homestead claimant and another party c[an] be ordered." (*Id.* at p. 766.) It means that an order of sale will not issue "if a joint encumbrance exceed[s] one-half the value of the property," and that even where an order is proper, "quite often no sale w[ill] be effected . . . because the bid that must be received (the total encumbrance plus the homestead exemption) w[ill] far exceed the actual value of the interest being sold." (*Ibid.*) In such circumstances, joint tenancy property simply "cannot be sold" in execution.[9] (11 Cal.App.3d at p. 766.)

Neither side attempted to establish the relevant values below for purposes of determining whether it would have been possible to conduct an execution sale in light of these obstacles. Mrs. Probst's bankruptcy petition asserted that as of July 2004, the property had a market value of $580,000 as against encumbrances totaling over $1 million. These included a first and second deed of trust securing debts of some $281,000 and $37,000, respectively. If similar values were in effect during the time when plaintiff might have sought to execute on Robert Probst's one-half interest, it would appear that a trial court would have been bound to refuse to order an execution sale.

Plaintiff makes no attempt to substantiate, in light of these obstacles, the vague suggestion in her brief that had defendants adequately understood the vulnerability to which her lien was exposed, they could have "foreclos[ed] on" it or "negotiat[ed] with the Probsts to re-structure title to their home to protect [her] interests." Instead she offers the alternative proposition that she was inadequately *advised* concerning her case. Thus she asserts that defendants "failed . . . to advise [her] that she would lose her judgment lien . . . if Robert Probst died while title remained in joint tenancy," and somewhat more broadly, that they "fail[ed] to advise . . . upon Robert Probst's joint tenancy interest." She does not suggest what defendants' advice should have been or how different advice might have led to a different result. Nowhere does

---

[9] In reaching these conclusions, the *Schoenfeld* court suggested that the statutory language from which they flowed might have been "adopted without consideration of encumbrances on jointly owned property." (*Schoenfeld, supra,* 11 Cal.App.3d at p. 766.) But 40 years later, after many statutory amendments including moving the applicable sections to another code, we see no indication that the Legislature has made any material change in the relevant language. (See *id.* at pp. 761–762, 765–766, citing and quoting Civ. Code, former §§ 1254, 1255, 1256; cf. Code Civ. Proc., §§ 704.780, 704.800, subd. (a), 704.850.)

plaintiff allege, aver, or even *argue*, that had she been properly advised, she would have instructed defendants to handle her case differently.

Nor is there any reason to suppose that she would have done so. The authorities strongly suggest that no reasonable litigant in plaintiff's position, however fully advised, would have instructed her attorneys to seek to execute on Robert Probst's joint tenancy interest. The mere attempt to execute on a dwelling "is a cumbersome, time-consuming and expensive undertaking." (Ahart, *supra*, ¶ 6:757, p. 6D-96.1 (rev. # 1, 2010); see *id.*, ¶¶ 6:169, p. 6B-7 (rev. # 1, 2010), 6:308, p. 6D-2 (rev. # 1, 2009); cf. *id.*, ¶ 6:153, pp. 6B-1 to 6B-2 (rev. # 1, 2010).) Even if it succeeds the creditor may not recoup all of these expenses. (See *id.*, ¶ 6:308, p. 6D-2 (rev. # 1, 2009).) If it fails she certainly will not. (See Code Civ. Proc., § 704.840, subd. (b).) And the attempt may never get the chance to fail or succeed, for it may drive the debtor to seek protection in bankruptcy. (Ahart, *supra*, ¶ 6:310, p. 6D-2 (rev. # 1, 2009); see *id.*, ¶ 6:155, p. 6B-2 (rev. # 1, 2010).) Once in that forum, he might well seek to avoid (extinguish) the lien, in whole or part, under federal law.[10] (Ahart, *supra*, ¶ 6:155, p. 6B-3 (rev. # 1, 2010).)

The course actually followed here—waiting for another creditor to foreclose on the property—offered plaintiff the advantages of reduced expense and a reduced risk of forcing the debtor into bankruptcy. It also offered the potential advantage of *enlarging* the interest encumbered by the lien in the event that *Deysi* Probst should die and be survived by Robert Probst, the judgment debtor. Had that happened, Robert would have succeeded to the whole property, doubling the value available to satisfy plaintiff's debt. (*Zeigler v. Bonnell* (1942) 52 Cal.App.2d 217, 221 [126 P.2d 118].) In other words, even when execution is a practical option, a creditor in plaintiff's position—not knowing which cotenant will survive the other—is faced with a choice between exercising that option, thereby forcing a severance and limiting the attached property to the debtor's one-half interest, and "gambl[ing]" that the debtor will survive his cotenant, making the entire property available for execution. (1 Goldsmith et al., Cal. Debt Collection and Enforcement of Judgments, *supra*, § 11.11[5][a], p. 11-24 (rel. 5-9/2008).) There is no reason to suppose that one in plaintiff's position would have chosen the expensive bet (attempting to execute) over the free one, which consisted essentially of waiting for another creditor to foreclose, particularly given the seemingly long odds against the more expensive bet's paying off.

The difficulties in obtaining a severance by execution appear not to have been lost on the court below, which characterized as "somewhat speculative"

---

[10] Neither side attempts to establish the extent to which plaintiff's lien might have been avoidable in whole or part under federal bankruptcy law had it not already been extinguished by the death of Robert Probst.

the question "whether or not plaintiff would have chosen the option of proceeding to execute against this real property that was held in joint tenancy because of, one, the age of the husband being 39 and it was unlikely that he was going to die, and, two, it's not clear whether you can execute on a single family residence under these circumstances." This seriously understates the degree of conjecture reflected in this theory. In fact it appears extremely unlikely, "if not impossible," that an execution sale could have been successfully conducted even if Robert Probst's death had been foretold and the extinguishment of plaintiff's lien perfectly foreseen. (Ahart, *supra*, ¶ 6:757, p. 6D-96.2 (rev. # 1, 2010).) The court was thus right to find "speculative" the necessary notion that plaintiff would have authorized such a course. In fact a well-advised client almost certainly would not do so.

■ This analysis establishes only the absence of any reason to suppose the *loss of the lien* could or would have been prevented. Plaintiff also suggested below that defendants' failure to appreciate the significance of Robert Probst's death *after it occurred* furnishes grounds for a claim against them. But we find no direct attempt to defend this suggestion on appeal, and the only factual support we find for it in the record is plaintiff's averment that had she known in 2005 that the lien had been lost, "I would never have sold one of my other properties to finance my purchase of the Probst residence at the foreclosure sale." This suggests, albeit obliquely, that plaintiff was *affected* by defendants' failure to advise her of the extinction of the lien and their mistaken advice that she could make herself whole by bidding at the foreclosure sale. But if plaintiff wished to proceed on such a theory it was incumbent on her to show not merely that she *relied* on defendants' poor advice but that she was *injured* by it. I may rely on someone's advice in selling some stock, but that alone will not vest me with a cause of action even if the advice was negligent or, for that matter, malicious. It must appear that as a result of the advice I was placed in a position that was worse than the one I would have occupied without it. In this instance, if plaintiff received the fair market value of the property she sold, then presumably she was *not* harmed by its sale. If she suffered compensable injury in some other way, it was incumbent upon her to say so. Here, as in all of plaintiffs' belatedly suggested amendments to the complaint, critical elements of the suggested theory of liability are entirely missing.

B. *Negligent Advice Concerning Suit Against Former Attorney*

Plaintiff alludes in her briefs to a second theory of recovery to the effect that defendants negligently advised her about the wisdom of bringing suit against Reid Schantz, the attorney who acted as escrow in the sale of the bakery and who, according to plaintiff, also represented her in that transaction. As she describes the relevant facts, "Smith reviewed her case, then

recommended in writing that she sue S[c]hantz for his professional malprac-tice. [Record citation.] However, despite this written advice, Smith orally recommended against and discouraged Dang from doing that, telling her that S[c]hantz was more valuable to her as a 'good witness' in her case against Deaton and Probst. [Record citation.]" She elsewhere suggests, somewhat obliquely, that defendants gave negligent advice in telling her "that Mr. S[c]hantz's witness value outweighed the value of pursuing him for liability."

In contrast to the claim that defendants failed to adequately protect plaintiff's lien, this new theory of recovery marks a distinct departure from anything alleged in the complaint. That pleading mentions Schantz only once, in an early allegation describing him as having "handled" the "Escrow of the Bakery sale." There is no suggestion that plaintiff might have had a cause of action against him and no reference to any advice defendants might have given her in that regard. This new theory therefore represents a distinct cause of action, arising from a distinct set of facts, as compared to anything alleged or hinted at in the complaint.

■ A party cannot generally defeat a summary judgment by pointing to a theory of liability or defense that has no basis in the pleadings. "[T]he pleadings set the boundaries of the issues to be resolved at summary judgment. [Citations.] A 'plaintiff cannot bring up new, unpleaded issues in his or her opposing papers. [Citation.]' [Citations.] A summary judgment or summary adjudication motion that is otherwise sufficient 'cannot be success-fully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings.' [Citation.]" (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648 [32 Cal.Rptr.3d 266].) If a party seeks to avoid summary judgment by going outside the pleadings, it is incumbent upon him to *move to amend* in a timely fashion. (*Ibid.*; *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264–1265 [102 Cal.Rptr.2d 813], citations omitted ["If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing . . . ."].) And in moving to amend, he must "[i]nclude a copy of the proposed amendment or amended pleading." (Cal. Rules of Court, rule 3.1324(a)(1); cf. 5 Witkin, *supra*, Pleading, § 1200, p. 632 [in absence of proposed amendment, it will be "almost impossible to show an abuse of discretion in denying the motion"].)

Plaintiff seeks to avoid the effect of these principles by contending that (1) defendants' motion was in effect one for judgment *on the pleadings*, and (2) the trial court was therefore obliged, on its own motion, to grant leave to amend. We emphatically reject the first premise and therefore do not reach

the second. Defendants filed a perfectly ordinary motion for summary judgment, premised on the *factual* negation, by extrinsic proofs, of the central allegation of the complaint, namely, that defendants had failed to record a judgment lien. This was not a facial challenge to the complaint, but a classic "speaking motion," i.e., one resting on evidence outside the pleadings. (See 5 Witkin, *supra*, Pleading, §§ 1004–1006, pp. 412–418 [describing former nonstatutory "speaking motion to dismiss"]; *Pianka v. State of California* (1956) 46 Cal.2d 208, 211–212 [293 P.2d 458] [acknowledging former practice but holding it "superseded by the procedure governing motions for summary judgment"].)

Nor is there any reason to suppose the complaint could have been amended to allege facts supporting a viable theory of liability predicated on defendants' advice concerning plaintiff's potential remedies against her former attorney. As plaintiff admits, in December 2000—about five weeks after plaintiff retained defendants—an attorney with defendant firm wrote to plaintiff about her potential claims against Attorney Schantz. The author said that plaintiff might well have a viable claim against Schantz and that the statute of limitations might run on such a claim as early as May 2001. She then added, "Legal malpractice is a specialized area of law, and *no one in this law firm practices in that area.* We *recommend you seek legal advice* regarding the potential conflict of interest of Reid S[c]hantz. If you would like us to provide you with a list of attorneys who practice in that area, we would be happy to do so." (Italics added.)

Plaintiff acknowledged in deposition that she did not follow this advice, adding, "I don't have money to keep consulting lawyers." This puts her in the position of having to claim that she reasonably relied on the opinion of attorneys who had told her they were not familiar with the relevant area of law and who advised her in unmistakable terms to seek advice from someone who was.

Nor is this the only obstacle such a theory would encounter. According to plaintiff's deposition testimony, defendant Smith told her, "You may have a case against Reid, but it's better for us to have him as our witness. He's our key witness, we need him on our side." Plaintiff has never offered to specify in what respect such advice, if given, was mistaken, let alone negligent.[11] Nor has she attempted to say how she might surmount the very considerable

---

[11] Smith testified that he consulted Schantz frequently in investigating the case against the buyers: "Reid Schantz had the—as escrow holder, was a potential witness in the case. And we had questions about what happened in the transaction, and he was the best witness we had of what they were. So if we needed information, we often contacted him." Apparently referring to billing records reflecting some of these conversations, Smith continued, "And he was trying to advance Sherry's cause. I see one of those conversations was about a house, so he was probably trying to tell us there was a house out there, for whatever worth that is."

barriers posed by questions of causation and damage in a legal malpractice claim predicated on the loss of a *previous* malpractice claim that itself involved negligent or tortious handling of a business transaction with two persons who, with or without their spouses, appear to have been bound for bankruptcy. Plaintiff has made no attempt to specify how she would have fared better had the bakery sale been handled in what she now views as a proper manner. (See *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1244 [135 Cal.Rptr.2d 629, 70 P.3d 1046] ["[A] plaintiff in a transactional malpractice action must show that *but for* the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result."].) Indeed, she does not favor us with an account of what that proper manner would have been. She has suggested from time to time that Schantz should have insisted that the buyer's wives sign the contract, but this assumes a fact plaintiff has never asserted, let alone offered to prove, which is that such a requirement could successfully have been imposed.

Given these circumstances, the trial court might well have acted within its discretion in denying a motion to amend. Since no such motion was ever made, and no proposed amended pleading was ever tendered, such a question cannot arise. The trial court did not err in concluding that plaintiff's claim of negligent advice concerning her remedies against her former attorney did not supply a basis for denying defendants' motion for summary judgment.

### C. *Negligent Advice Concerning Contract*

This leaves plaintiff's third new theory of recovery, which she usually describes as resting on defendants' "unexplained failure to . . . properly analyze[] the sale contract between Dang and Messrs. Deaton and Probst, and to . . . advise[] [plaintiff] that no contract was ever formed due to the failure of the condition precedent." We surmise that this theory refers to facts asserted as follows in the factual summary of plaintiff's brief: "Although a term of the [sales] agreement created the condition precedent that [plaintiff's seller] give express approval to the [buyers'] assumption [of plaintiff's debt to the seller], S[c]hantz allowed escrow to close without that approval." Plaintiff was apparently referring to this same grievance against Schantz when she testified in deposition, "[H]e gave them the keys and allowed them to move into the bakery before closing escrow. So, after they move[d] all the machinery out of my property, out of the property where Mity Nice Bakery was, to their location, they didn't care to come back to close escrow." But she has made no attempt to show that this would ground a colorable claim of malpractice distinct from the conflicts of interest of which defendants' letter spoke. Having been advised to seek separate counsel with respect to any such claim, it is impossible to see how she could succeed in holding defendants responsible for its loss.

Nor does plaintiff attempt to show that she might have achieved a more favorable result in her case against the buyers if she had taken the position that "no contract was ever formed." Such a premise might have been beneficial if she had sought to recover possession of the bakery, but in terms of compensatory damages it would seemingly have relegated her to such remedies as she might have in tort. She has never so much as hinted at any of these matters, and nothing in this record suggests that they are more than theoretical hypotheses, incapable of substantiation.

 In the end it appears that plaintiff sold a distressed business to some buyers who, upon defaulting, were unable to satisfy the judgment she obtained against them. Although defendants apparently succeeded in collecting some part of the judgment, plaintiffs' last and best chance of recovering the balance was destroyed by a lethal twist of fate. The law governing joint tenancy and the execution of judgments combined to make the resulting harm to plaintiff inevitable. It does not appear that plaintiff has at all times been well served by the attorneys she engaged, either in the original transaction, her attempts to collect from the buyers, or the present matter. Neither does it appear, however, that she could establish a viable claim against defendants under any allegations suggested by this record. For this reason, among others, no error appears in the order granting summary judgment.

#### DISPOSITION

The judgment is affirmed.

Premo, J., and Elia, J., concurred.