Filed 1/21/14  Alevy v. Dolores-Frances Affordable Housing CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ALLEN E. ALEVY,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>DOLORES-FRANCES AFFORDABLE<br>HOUSING, L.P., et al.,<br>        Defendants and Appellants. | B239110<br><br>(Los Angeles County Super. Ct.<br>No. BC428948, cons. w/BC432823) |
| PICO UNION HOUSING<br>CORPORATION,<br>        Plaintiffs and Appellants,<br><br>        v.<br><br>ALLEN E. ALEVY,<br>        Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Kevin Clement Brazile, Judge.  Affirmed in part, reversed in part.

Lurie, Zepeda, Schmalz & Hogan, Kurt L. Schmalz and Shawn M. Ogle for Appellants Pico Union Housing Corporation and Dolores-Francis Affordable Housing L.P.

Westland Industries, Craig H. Missakian; Sragow & Sragow and Allen P. Sragow for Respondent Allen E. Alevy.

_____

This appeal concerns ownership of a parking lot property known as Lot 20, which is adjacent to an apartment building on Lot 22 that is now owned by a non-profit entity for use as low-income housing. The owners of the apartment building and their predecessors believed that they held title to the parking lot since they acquired the apartment building by foreclosure in 1992.

But no. It turns out that title to the two properties diverged in the 1980's, apparently arising from the previous owners' inadvertent seven-year delay in recording one of the lots' inclusion in an earlier transfer of the properties. As a result, owners of the affordable-housing apartments on Lot 22 have believed since 1992 that they owned the adjacent Lot 20 parking lot as well. Unaware of the defect in their title, they paid taxes on Lot 20, they have paid and discharged a loan that was secured by a trust deed on both properties, and they have improved, maintained, and continued to use the parking lot for the exclusive use and benefit of the apartment building's tenants.

In 2002, however, the plaintiff foreclosed on a 1988 encumbrance on Lot 20 (which due to the earlier recording delay had been omitted from a Community Redevelopment Agency (CRA) foreclosure on the Lot 22 parcel). In 2009, the plaintiff sued to quiet title to Lot 20.

The defendants appeal from the trial court's denial of summary judgment, and from its judgment rejecting their claims to title to Lot 20 by adverse possession or for an implied easement for its use as a parking lot for the benefit of the tenants of the Lot 22 apartments. We affirm the judgment with respect to adverse possession, but the judgment to the extent it rejects the claim of an implied easement is reversed.

## BACKGROUND AND PROCEDURAL HISTORY

### The Pleadings

Plaintiff Allen E. Alevy is a sophisticated and experienced real estate investor and owner of a real estate business that owns and operates a great number of properties, such

2

as shopping centers, apartment buildings, and mobile home parks.[1]  On December 30, 2009, he filed case number BC428948 against defendant Dolores-Frances Affordable Housing, L.P. (Dolores-Frances), seeking to quiet title and for related relief with respect to a parking lot property at 1032 South Burlington Avenue, known as Lot 20, in the Pico Union neighborhood of Los Angeles.  Soon afterward, the Pico Union Housing Corporation (Pico Union) filed case number BC432823 against Alevy, to quiet title to Lot 20 and, in the alternative, for a prescriptive easement on it.  The court appropriately consolidated the related cases.[2]

Alevy alleged in his December 30, 2009 verified complaint that since 1992 or 1993, Pico Union and Dolores-Frances had "entered and exclusively encroached upon Lot 20," by constructing concrete block walls and a metal guardrail, installing clicker-controlled iron gates, and paving and striping the property for use as a parking lot. He alleged that since 1992 to 1993 the control and use of Lot 20 by the owners of Lot 22 "has been continuous and always to the complete and total exclusion of [Alevy and predecessor owners of Lot 20]."  He alleged in addition that Dolores-Frances and Pico Union "have maintained exclusive control and use of Lot 20 to their sole benefit by enclosing and possessing Lot 20 to the complete exclusion of [Alevy and his predecessors] since Lot 22's use of Lot 20 began in 1992/1993."  And he alleged that Dolores-Frances and Pico Union had refused to relinquish their exclusion of Alevy from Lot 20, but instead had asserted their acquisition of prescriptive rights over Lot 20,

---

[1] Alevy testified that he owns between 500 and 1,000 properties, and that his deposition had been taken more than 50 times.

[2] The lead case was ordered to be case number BC428948. The nature of the controlling issue in this appeal makes it unnecessary to set forth in detail the properties' complex history of ownership, transfers, and encumbrances, or to identify all the parties to those mesne transactions or how and why they came about.  For consistency and simplicity, we refer to Allen E. Alevy as the plaintiff, and to Pico Union Housing Corporation as the defendant, except where further detail is required.

3

"which was and remains totally enclosed by [Dolores-Frances] and has been totally enclosed to the full exclusion of [Alevy] since 1992/1993."[3]

Pico Union's March 2, 2010 verified complaint alleged Pico Union's encroachment on Lot 20 to the exclusion of Alevy and others, beginning in 1992. Alevy's answer admitted "that throughout parts of 1992 and 1993 [Pico Union] entered and exclusively encroached upon Lot 20 to maintain the security gate and to use Lot 20 as parking for tenants at [Lot 22] . . . ." Consistent with the affirmative allegations of its own complaint, Alevy admitted that Pico Union "occupied, controlled and used Lot 20 to the exclusion of others from its purchase of Lot 22 in 1992 until its ownership of Lot 22 ended in 2004." And it admitted that Pico Union's use of Lot 20 during that period was open and notorious.

Pico Union's complaint also alleged, in paragraph 19, that "[Pico Union] did not have any discussions with Defendants [Alevy or his agents] regarding Lot 20 until 2002, approximately ten years after Plaintiff began using Lot 20 as a parking lot." And in paragraph 20, Pico Union alleged that Pico Union "never requested or received permission from [Alevy or his agents] to use Lot 20 as a parking lot or to construct and maintain any of the improvements built upon Lot 20." Alevy's verified answer admitted "the allegation of paragraph 19 of the Complaint that no oral discussions occurred," while denying paragraph 19's "remaining allegations." His answer denied "the allegations of paragraph 20," affirmatively alleging that "Permission was provided to Lot 22's owners."

**Denial of Pico Union's Motion for Summary Adjudication**

After the cases were consolidated, Pico Union moved for summary adjudication of its causes of action for quiet title and declaratory relief. Its motion claimed that undisputed evidence established each of the factual elements of its cause of action for adverse possession of Lot 20, based on its "continuous and uninterrupted actual, open and

---

[3] Lot 22, at 1908 West Eleventh Street, is occupied by an apartment building adjoining the Lot 20 parking lot. At some earlier time a 19th century home on Lot 20 apparently had been demolished in order to create parking for what was then a hotel, and later became the apartments eventually owned by Pico Union, on Lot 22.

4

notorious possession" and payment of property taxes on Lot 20 "for at least five consecutive years under a claim of right."

Alevy's response admitted the following relevant facts: that in May 1986 the CRA loaned $825,000 to the then-owners of Lot 22; that in November 1988, the CRA foreclosed on its security and acquired title to Lot 22; that in January 1992, the CRA sold Lot 22 to Pico Union to operate as low-income housing and for related commercial uses; that Pico Union believed when it acquired the Lot 22 apartments that it also had acquired ownership of Lot 20, "an adjacent parcel that had been historically part of the Apartments"; that from sometime before Pico Union acquired Lot 22 in 1992, Lot 20 had been enclosed, improved, and used and maintained as controlled-access parking for tenants of the Lot 22 apartments; that Pico Union posted a plaque on the front gate to Lot 20 stating: "Right to Pass by Permission and Subject to Control of Owner Pico Union Housing Corp. §1008 Civil Code"; that since 1992 Pico Union has continuously and exclusively occupied, controlled and used Lot 20 as a parking lot for Lot 22's tenants, to the exclusion of others; and that Pico Union has paid property taxes on Lot 20 directly or through its lender for the five tax years from 1995/1996 through 1999/2000.[4]

In opposition to summary adjudication, Alevy also contended that he had at some time in 1993 or 1994 given permission to someone he believed to be a representative of Pico Union, for Pico Union to use Lot 20 as a parking lot; and that in any event, his status as a mere lienholder during the relevant period precluded Pico Union's claim of adverse possession as a matter of law. And he denied Pico Union's claim that it "did not receive permission to use Lot 20 from Alevy."

The trial court denied Pico Union's summary adjudication motion. Its written explanation noted Alevy's acknowledgment that Pico Union's use of Lot 20 had been open and notorious, continuous and uninterrupted, and under a claim of right, and that Pico Union had paid taxes on the property for a period of five years, constituting all of

---

[4] Civil Code section 1008 provides that when signs with that message are placed by a property owner at the entrance to the property and at specified intervals along its boundaries, no one's use of the property can ripen into a prescriptive easement.

5

the elements of a cause of action for adverse possession, except only the element of "hostility." But Alevy's evidence that he had granted Pico Union permission to use Lot 20 as a parking lot, the court held, required denial of summary judgment because it showed that Pico Union's use of Lot 20 was not undisputedly hostile to Alevy's interest in the property.

**The Parties' Pretrial Stipulation**

The parties entered into an extensive stipulation of issues, facts, exhibits, witnesses, and other matters, including the following events:

1. In March 1979, the Yacoobians acquired the Lot 22 apartments and the adjoining Lot 20 from the Weingart Foundation, granting the Weingart Foundation a trust deed on Lots 20 and 22 securing a debt of $318,750.

2. In May 1981, the Yacoobians sold Lot 20 and the Lot 22 apartments to an ownership group of approximately seven couples. (The identity of the members of the ownership group changed somewhat, in ways not relevant here, through a number of transactions in March 1985, and again in May and June 1988.)

3. In May 1986, the California Redevelopment Agency (or the Los Angeles Community Development Fund (collectively, CRA)) made a redevelopment loan of $877,943.05 to the then-owners of Lots 20 and 22, secured by a trust deed on Lot 22 only, but not on Lot 20.[5]

4. In May 1988, Alevy obtained trust deeds on both Lots 20 and 22, as security for a loan of $400,000 to the joint owners of both lots. The ownership group also granted Alevy an exclusive 30-year agency to manage both properties on their behalf.

---

[5] It is undisputed that the failure of the CRA to include Lot 22 in the CRA's 1986 trust deed was a mistake, apparently resulting from the Yacoobians' inadvertent failure to clearly identify Lot 20 in their 1981 grant deed to the ownership group, and Lot 20's resulting omission from the recorded chain of title, at least temporarily. In February 1988, the Yacoobians recorded a quitclaim deed confirming their intention in 1981 that the grant to the new ownership group included both parcels and not just Lot 22.

5. In November 1988, CRA obtained title to Lot 22 from the then-owners of both lots, through foreclosure on the CRA's 1986 lien.[6]

6. In January 1992, Pico Union obtained title to the Lot 22 apartments by grant deed from the CRA. (Pico Union believed at that time that it had also acquired Lot 20, the adjacent parking lot; its Disposition And Sale Agreement with the CRA had an attached site map showing both Lot 20 and Lot 22 as included in the sale.)

7. In February 1992, Pico Union began servicing the 1979 Weingart Foundation debt secured by both Lot 20 and Lot 22. Over the following years the Weingart Foundation lien was transferred to the California Community Foundation, then to a series of banks. In December 2003, Pico Union finished paying off the debt, obtaining a full reconveyance of the deeds of trust on Lots 20 and 22.

8. Since 1992, Pico Union has enclosed, improved, and continuously, openly, notoriously, and exclusively occupied and possessed Lot 20 as a parking lot for tenants of Lot 22, to the exclusion of all others.

9. Pico Union paid the property taxes assessed on Lot 20 for the five tax years from 1995/1996 through 1999-2000.

10. In November 2002, Alevy obtained a trustee's deed to Lot 20 by foreclosure on his 1988 lien. (Alevy's lien on Lot 22, securing the same debt, had been extinguished in November 1988, when the CRA obtained title to Lot 22 by foreclosure on its senior lien.)

11. In February 2004, Pico Union transferred title to the Lot 22 apartments to Dolores-Frances, which since then has used the property as affordable housing and related commercial uses, and has continued the use of Lot 20 exclusively as parking for tenants of the Lot 22 apartments.

---

[6] The trial court determined in its statement of decision that by early 1988 the Lot 22 apartments "had become severely blighted" and the owners were at risk of being cited by the City for sub-standard housing. Alevy confirmed the characterization of the property as "slum housing"; he testified that the City's slum housing task force had issued many citations against the property during the years he was its exclusive manager.

12. In December 2009, Alevy sued Dolores-Frances for quiet title to Lot 20, and for related relief, and in March 2010, Pico Union sued Alevy, in the now-consolidated actions leading to this appeal.

The parties' stipulation also identified the issues to be determined by the trial of the consolidated cases. The first issue was "[w]hether Pico Union's possession of Lot 20 was hostile to the then-owner's title or whether Pico Union was given permission to use Lot 20 as a parking lot." They expressly stipulated that Pico Union had satisfied all other elements of its claim for adverse possession of Lot 20. The second issue to be decided was whether, as a matter of law, the period of adverse possession ran against Alevy, in light of his claim that until November 2002 his interest in Lot 20 was only a lien. The third issue to be tried was whether (if Pico Union is found not to be the owner of Lot 20 by adverse possession) it has a prescriptive easement or implied easement to use Lot 20 as a parking lot for the Lot 22 apartments.[7]

The stipulation expressly preserved Pico Union's objection to Alevy's testimony about any oral discussions with Pico Union about Lot 20 before 2002, based on his verified answer's admission "'that no oral discussions occurred.'"[8] The trial court expressly adopted the parties' stipulations.

---

[7] The parties also stipulated that in the event Pico Union is found not to be the owner of Lot 20, the court would determine whether Alevy had the right to eject it from possession of Lot 20. At the close of trial, Alevy voluntarily dismissed his ejectment cause of action. In the context of this case, the elements of the ejectment cause of action overlap those of Alevy's quiet title claim. (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 634 [where title is alleged, action for ejectment "has been largely superseded" by statutory quiet title action], § 655 [modern quiet title and ejectment actions overlap].) Alevy's dismissal of the ejectment claim without prejudice therefore does not deprive the judgment of finality, and does not deprive this court of jurisdiction to hear this appeal. (*Kurwa v. Kislinger* (S201619, filed Oct. 3, 2013) __ Cal.4th ___ .)

[8] The parties stipulated that in early 2011, Alevy donated Lot 20 to a religious institution, but that his divestment of title to the property did not deprive him of standing to continue appearing as a party in the trial court and in this appeal. (Code Civ. Proc., § 368.5.)

8

**Relevant Evidence at Trial**

Alevy testified (over Pico Union's objections) that in 1988 he had obtained a lien on Lot 20 and Lot 22 from the properties' then-owners.[9] He said that in about 1991 or 1992 he met with agents of Pico Union—a short Hispanic lady who identified herself as "the property management company" and a gentleman identified as the building manager—at Lot 20 and the Lot 22 apartments; and that he orally offered Pico Union permission to continue to use Lot 20 as a parking lot without cost, and told them to keep the property clean. Since then he had no further conversations with anyone at the property.

Alevy testified that sometime after the meeting, on the advice of an attorney, he had an employee (now deceased) "put four plaques into the ground," saying "you can cross over and we've given you permission." Alevy saw his employee installing two of the plaques. Alevy offered the testimony of another employee that in 2008, at Alevy's direction, he looked for the four plaques but was able to find only one (a photo of which was admitted as Exhibit 6), which said, "Right To Pass By Permission And Subject To Control Of Owner. Section 1008, Civil Code."

Pico Union presented the testimony of Pico Union's CEO since 1986; the testimony of the property manager for the Lot 22 apartments and Lot 20 since 1992; and the testimony of the on-site manager for those properties from 1994 through 2004, who had been the maintenance man for the Lot 22 apartments and Lot 20 parking lot from 1992 to early 1994. These witnesses each denied ever having met with Alevy in the 1990's (or anytime before the lawsuit), and testified that they had never received permission for Pico Union's use of Lot 20 from Alevy or anyone else.

---

[9] As of mid-1988, Lots 20 and 22 shared the same street address, and were owned by a group consisting of a handful of individuals and a corporation (CBA Industries, Inc.) in which various of Alevy's family members owned interests. Alevy had created CBA Industries, Inc. in 1988 and claimed to have had sole management of its interests.

**Statement of Decision and Judgment**

The trial court entered judgment for Alevy. It credited Alevy's trial testimony that sometime in the early 1990's he had told Lot 22's managers that they could continue to use Lot 20 as a parking lot for the benefit of Lot 21. It held that Pico Union's possession of Lot 20 therefore was not hostile to the interests of Lot 20's then-owners. And it found that Pico Union did not obtain an easement—whether implied, prescriptive, or equitable—for use of Lot 20 as a parking lot. In light of its decision on the adverse possession issue, the court did not consider whether the period of adverse possession would otherwise have run against Alevy's lienhold interest in Lot 20.

## DISCUSSION

On appeal Pico Union contends that the trial court erred in entering judgment for Alevy, based on either of two grounds. It contends first that its adverse possession of Lot 20 for the five years from 1995 through 2000 would have been established by uncontradicted evidence, were it not for the erroneous admission of Alevy's testimony that he had orally granted Pico Union permission to continue using Lot 20 as a parking lot—contradicting his pleadings and responses to requests for admission that he had no such conversation. Second, Pico Union contends that even if its adverse possession claim fails, uncontradicted evidence shows that Pico Union was entitled to an implied easement to use Lot 20 as a parking lot for the benefit of Lot 22's tenants.

We conclude that Pico Union is not entitled to reversal of the judgment's denial of its claim for title to Lot 20 by adverse possession. However, the trial court erred by relying upon erroneously admitting evidence when it denied the claim for an implied easement for use of Lot 20 as a parking lot for the benefit of the tenants of Lot 22, requiring reversal of that portion of the judgment.

### A. The Evidence Does Not Sustain Pico Union's Claim To Title By Virtue Of Its Adverse Possession Of Lot 20.

Title by adverse possession is established by proof of continuous, uninterrupted, open and notorious possession of property under claim of right, adverse and hostile to the rights of the true owner, and the payment of taxes assessed on the property for five

10

continuous years. (Civ. Code, § 1007; Code Civ. Proc., § 321; *West v. Evans* (1946) 29 Cal.2d 414, 417; *California Maryland Funding, Inc. v. Lowe* (1995) 37 Cal.App.4th 1798, 1803.) The parties stipulated that Pico Union had established all of these elements of its cause of action for adverse possession of Lot 20 from the 1995/1996 through 1999/2000 tax years, except only the element of "hostility"—whether Pico Union's exclusive possession of the property was "hostile" to the interests of Lot 20's title holders during that period.

Alevy disputed the element of hostility on two grounds: first, that sometime in the early 1990's he had orally granted Pico Union permission to continue using Lot 20 as a parking lot, rendering Pico Union's possession permissive and not hostile; and second, that as a matter of law, Pico Union's possession of Lot 20 could not be hostile or adverse to the nonpossessory lienhold interest he held in Lot 20 before he obtained title (and a right to possession) by foreclosure on his trust deed in 2002.

We conclude that under the undisputed facts, Pico Union acquired a right to title to Lot 20 by adverse possession as of 2000. But Pico Union nevertheless is not entitled to judgment against Alevy.

Under the stipulated facts, Pico Union's ownership of Lot 20 arose from its adverse possession and payment of taxes on Lot 20 for the five years from 1995 through 2000; the title it obtained by adverse possession therefore was encumbered by the same trust deed that had encumbered the title of Lot 20's dispossessed owners: Alevy's preexisting 1988 trust deed. The fact that Alevy's trust deed was a nonpossessory lienhold interest did not prevent Pico Union's adverse possession of Lot 20 from effectively ousting its then-record owners from title; but Pico Union could gain by adverse possession no better title than that of the owners it had dispossessed. Pico Union's claim to Lot 20's title by adverse possession—like any other title subject to a preexisting lien—remained subject to Alevy's preexisting lien, and therefore was eliminated by Alevy's foreclosure in 2002.

1. **The trial court's determination that Pico Union's possession of Lot 20 was permissive and not hostile cannot be sustained; the evidence that Alevy granted permission for Pico Union's use of Lot 20 as a parking lot was inadmissible.**

Pico Union's use of the Lot 20 property, admittedly based on its mistaken belief in its title and right to do so, raised a presumption that its use was hostile to the interests of its owners and was not permissive. "When it appears that the occupier enters the land mistakenly believing he is the owner, possession is adverse unless it is established by substantial evidence that he recognized the potential claim of the record owner and expressly or impliedly reflected intent to claim the disputed land only if record title was determined in his favor." (*Gilardi v. Hallam* (1981) 30 Cal.3d 317, 326.) And even without this presumption, the CRA's possession of Lot 20 was unquestionably hostile to the ownership group's title from the outset of its acquisition of Lot 20's title in 1988. Alevy testified that in 1988 he told the CRA (apparently in his role as the properties' exclusive manager) that the CRA had not acquired title to the parking lot, and that "you're not going to get it and you don't have parking and screw you." Alevy's uncontradicted testimony can only be interpreted as a recognition that the use of the Lot 20 parking lot, by the CRA and later by its grantee Pico Union, was adverse and hostile to ownership rights of Alevy's principals.

The burden therefore was Alevy's to present evidence sufficient to establish that Pico Union's use of the property was permissive, and therefore to overcome the contrary presumption arising from the stipulated facts and the evidence of Pico Union's use of the property to the exclusion of its then-owners. (*Gilardi v. Hallam*, *supra*, 30 Cal.3d at p. 326; *California Maryland Funding, Inc. v. Lowe*, *supra*, 37 Cal.Appp.4th at pp. 1806-1807.) Pico Union objected to the admission of any evidence on that issue, however, arguing that Alevy's verified answer constituted a judicial admission that Alevy had not granted permission for Pico Union's use of Lot 20. That objection was argued in connection with the summary adjudication motion, it was recognized and preserved by

12

the parties' pretrial stipulations, and it was reiterated during the trial. On each occasion, the objection was overruled.

In his verified answer to Pico Union's complaint, Alevy had admitted that "throughout parts of 1992 and 1993 [Pico Union] entered and exclusively encroached upon Lot 20 to maintain the security gate and to use Lot 20 as parking for tenants at [Lot 22]"; and that Pico Union "occupied, controlled and used Lot 20 to the exclusion of others from its purchase of Lot 22 in 1992 until its ownership of Lot 22 ended in 2004 . . . ." Pico Union's complaint alleged in Paragraph 19 that "[Pico Union] did not have any discussions with Defendants [Alevy or his agents] regarding Lot 20 until 2002, approximately ten years after Plaintiff began using Lot 20 as a parking lot." And Alevy's verified answer admitted "the allegation of paragraph 19 . . . that no oral discussions occurred," while denying that paragraph's "remaining allegations." In addition, Alevy admitted under oath, in answer to requests for admission, that he "did not assert any rights to enter Lot 20 from 1992 through 2001," and that he had been excluded from Lot 20 at all times after 1992.

Pico Union contends that these are "judicial admissions" that are binding on Alevy, and are not subject to dispute or contradiction by him. If that contention is correct, these facts would establish beyond dispute that Alevy had no oral discussions with Pico Union about Lot 20 before 2002, that Alevy had not granted oral permission for it to use Lot 20, and that Alevy had not caused plaques to be placed on Lot 20. These facts, if established, would show that Pico Union's use of Lot 20 was adverse and hostile to Alevy's ownership during the relevant period, entitling Pico Union to quiet title by adverse possession as a matter of law.

Judicial admissions—admissions made in a party's pleadings, stipulations, or responses to requests for admission—are "not merely evidence of the matter stated, but operate as 'a conclusive concession of the truth of [that] matter,' thereby 'removing it from the issues.' [Citation]." (*Dang v. Smith* (2010) 190 Cal.App.4th 646, 657, italics omitted.) They ""may not be contradicted[] by the party whose pleadings are used against him or her.""" (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735,

13

746.) "'When allegations in a complaint are admitted by the answer (a) no evidence need be offered in their support; (b) evidence is not admissible to prove their untruth; (c) no finding thereon is necessary; (d) a finding contrary thereto is error.' [Citation.]" (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271; Evid. Code, § 350 [only relevant evidence is admissible].)

But like all other statements, the meaning of a judicial admission is not always clear and unambiguous. And when an admission is reasonably susceptible to more than one meaning, the court must use its discretion to "'to elucidate and explain'" the admission, and to determine its scope and effect. (*Valerio v. Andrew Youngquist Construction*, *supra*, 103 Cal.App.4th at p. 1273; *Fredericks v. Kontos Industries, Inc.* (1987) 189 Cal.App.3d 272, 278 [owner's admission that contract required progress payments to contractor did not preclude explanation that right to payments depended on work performed].)

The issue here therefore is straightforward: it turns on the extent of the trial court's discretion concerning the meaning of Alevy's judicial admissions. If Alevy's admissions are understood to mean that Alevy denied having any discussions with representatives of Pico Union regarding Lot 20 before 2002, and that the record owners of Lot 20 were excluded from Lot 20 throughout the relevant period from 1995 through 2000, as Pico Union argues they unambiguously do, then the trial court erred in overruling Pico Union's objections and admitting Alevy's contrary testimony. If, on the other hand, the trial court correctly exercised its discretion to determine that Alevy's admissions were susceptible to a meaning consistent with his explanatory testimony, its admission of that testimony did not abuse its discretion.

The trial court permitted Alevy to testify that sometime in the early 1990's he and an employee (now deceased) "met with the property manager" at the Lot 22 apartments and orally gave his permission for Pico Union's continued use of Lot 20 as a parking lot for the tenants of its Lot 22 apartments, asking in exchange only that the lot be kept free of debris and homeless encampments. The conversation was with "the owner of the building," described as a short Hispanic lady and a gentleman identified as the building

14

manager. The conversation took place by the back door of the apartment building, "with the property management company and the gentleman that worked for the property management company."

Alevy explained that he gave that oral permission to Pico Union in order to free Lot 20's record owners from worry that the property might be subject to citation by the City, and to preclude any claim of adverse possession. And the court considered Alevy's testimony corroborated to some degree by his further testimony that either "at that meeting" or sometime thereafter he had instructed his employee to place two or more plaques on the property, which said that entry was by permission of the owners, pursuant to Civil Code section 1008.

Because Alevy's in-court testimony directly contradicted the unambiguous judicial admissions in Alevy's verified pleadings and answers to requests for admission, rather than simply explaining an ambiguity, the trial court erred in admitting Alevy's contrary testimony.

The issue is not whether the trial court was justified in crediting Alevy's testimony, but rather whether the testimony was admissible at all. We do not second-guess the trial court's determinations of the credibility of admissible testimony; but if Alevy's testimony on this point was inadmissible, it cannot be credited in the determination of the cause.

The trial court explained that it concluded that Alevy's testimony was admissible because the testimony did not contradict Alevy's judicial admissions. The trial court found "there is no contradiction between the trial testimony and the answer since the answer referred only to oral communications with 'Plaintiff,' which was defined in the complaint as [Pico Union] alone and did not include the separate property management company with whom Alevy had his conversation." Therefore, when Alevy admitted that he had no conversations with Pico Union regarding Lot 20 before 2002, he was admitting only that he had no discussions with *an employee of Pico Union*. The court concluded that Alevy had not intended to admit that he had no discussion with non-employee representatives of Pico Union such as its property managers.

15

But the trial court's reasoning does not bear scrutiny. The employment status of the individuals with whom Alevy discussed permission, as employees or some other sort of agents acting on Pico Union's behalf, was of no consequence to Alevy at the time, and is of no practical consequence here. Any discussions Alevy had with Pico Union would necessarily have been with some agents or representatives of Pico Union; as a corporation—an artificial entity—Pico Union could communicate only through its human agents and representatives. (*Acco Contractors, Inc. v. McNamara & Peepe Lumber Co.* (1976) 63 Cal.App.3d 292, 295-296.) Moreover, in discussing Lot 20's use as a parking lot, Alevy had to have known he was dealing with agents of Pico Union, whatever the identity of their immediate employer; dealing with Pico Union was the very purpose of the discussion, he testified. As he said, his meeting with those individuals was with "the owner of the building."

Not only did Alevy testify that he believed that the individuals with whom he spoke represented Pico Union, but that testimony was critical to his position. Unless those individuals represented Pico Union, his conversation with them could not possibly give Pico Union permission to use Lot 20. When he purportedly spoke to Pico Union's property manager at Pico Union's Lot 22 apartment building about the use of the Lot 20 parking lot for Lot 22's tenants, Alevy had to have believed that he was engaged in a discussion with Pico Union about the use of Lot 20—exactly the discussion that he denied in his verified answer in case number BC432823. He could have been under no other illusion.

Alevy's testimony also contradicts the allegations of his own verified complaint in case number BC428948, that ever since 1992 or 1993, Pico Union and Dolores-Frances had "exclusively encroached upon Lot 20"; that since 1992 to 1993 the control and use of Lot 20 by the owners of Lot 22 "has been . . . always to the complete and total exclusion of [Alevy and his predecessor owners of Lot 20]"; and that Dolores-Frances and Pico Union have maintained exclusive control and use of Lot 20 "to their sole benefit," possessing Lot 20 "to the complete exclusion of [Alevy and his predecessors]" since 1992/1993. These allegations cannot be reconciled with his trial testimony that since

16

1991 or 1992, Pico Union's use of Lot 20 has been by permission from Alevy, and that his grant of permission to use Lot 20 for parking was given in part for the benefit of its owners, to protect them from liability and responsibility to the City for the property's cleaning and maintenance.

Alevy's testimony that his employee placed plaques on Lot 20 also directly contradicts his admission that Pico Union "occupied, controlled and used Lot 20 *to the exclusion of others*" from 1992 to 2004, as well as to his admission in answer to requests for admission, that he had been excluded from Lot 20 from 1992 through the present, and that he "did not assert any rights to enter Lot 20 from 1992 through 2001." (Italics added.) His testimony about the placement of plaques on the property at his direction purports to constitute evidence that Pico Union *did not* exclude him (through his employee) from the property, and that *he did* assert a right to enter Lot 20.

Alevy's testimony on these subjects therefore was inadmissible. Without it, the record cannot sustain the trial court's determination, expressly in reliance on that inadmissible evidence, that Pico Union's use of Lot 20 as a parking lot was permissive and not hostile to the interests of its then-owners.

**2. Alevy's nonpossessory lienhold interest in Lot 20 was unaffected by Pico Union's acquisition of Lot 20 by adverse possession.**

The fact that until 2002 Alevy had no more than a nonpossessory lienhold interest in Lot 20 did not prevent Pico Union's adverse possession of Lot 20 from effectively ousting its then-owners from title; but Pico Union could gain by adverse possession no greater title than that of the owners it had dispossessed. Pico Union's claim to title by adverse possession—like any other title subject to a preexisting lien—was eliminated by Alevy's foreclosure on his preexisting lien in 2002.

The doctrine of adverse possession applies only to possessory estates; but Alevy's interest in Lot 20 during the 1995 through 2000 period, represented by his 1988 trust deed encumbering the property, was not a possessory estate. Pico Union's possession of Lot 20 therefore was hostile to the possessory interests of Lot 20's then-titleholders, but did not infringe on any rights Alevy held as a nonpossesory lienholder.

17

"To be considered hostile, the acts relied upon must operate as an invasion of the right of the party against whom they are asserted." (*City of San Diego v. Cuyamaca Water Co.* (1930) 209 Cal. 105, 133.) Pico Union's possession of Lot 20 did not invade Alevy's rights as a lienholder; therefore it was not adverse or hostile to Alevy's interest in the property. (*Laubisch v. Roberdo* (1954) 43 Cal.2d 702, 706-707 [prescriptive period of statute of limitations does not begin to run against purchaser at sheriff's sale until the sheriff's deed is delivered to purchaser]; *Leonard v. Flynn* (1891) 89 Cal. 535, 542 [same]; *Comstock v. Finn* (1936) 13 Cal.App.2d 151, 157-158 [possession is not adverse or hostile to nonpossessory interest in property].)

Pico Union's five years of exclusive use and possession of Lot 20 between 1995 and 2000 established its claim to title, after 2000, superior to that of Lot 20's then-record owners. This is confirmed by the reasoning applied in *Tobin v. Stevens* (1988) 204 Cal.App.3d 945. In that case, the plaintiff sought quiet title to a parcel based on a 1985 grant deed from the record owner. The Court of Appeal denied the claim, however, reasoning that the defendant's possession of the property for more than ten years before the action was filed would (if he paid the assessed taxes) entitle him to prevail against the grantee from the record owner. The period of adverse possession runs against the owner (or owners) of title, notwithstanding any transfers of that ownership during or after the period of adverse possession. (*Id*. at p. 953; *Sevier v. Locher* (1990) 222 Cal.App.3d 1082, 1084 ["Adverse possession refers to occupation or use of land adverse to legal title, not to a particular holder of legal title"].)

At the end of its five-year period of adverse possession of Lot 20 in 2000, therefore, Pico Union's right to the property had vested. No voluntary transfer of title by the record owners during or after that period, to Alevy or to anyone else, could interrupt the continuity of Pico Union's adverse possession, or impair Pico Union's right to title. (*Yorba v. Anaheim Union Water Co*. (1953) 41 Cal.2d 265, 270 [prescriptive period continues to run against title owners and their successors in interest until statute is tolled by filing of action that finally adjudicates right to title].)

18

But Pico Union's adverse possession of Lot 20 could not result in title superior to that held by Lot 20's owners at the outset of the adverse possession. The long-established underlying principle is that "[t]he new title thus acquired by the disseizor must of necessity correspond with that on which the disseizen operated, as he could not acquire by disseizen a greater estate than that held by the disseizee." (*Williams v. Sutton* (1872) 43 Cal. 65, 73.)

Acts affecting the title and security interest held by the trustee of a trust deed are unaffected by acts of the owner subsequent to the trust deed. (*Homestead Savings v. Darmiento* (1991) 230 Cal.App.3d 424, 437 [interest of successor to trustor of trust deed is subordinate to earlier-recorded trust deed]; see *Dover Mobile Estates v. Fiber Form Products* (1990) 220 Cal.App.3d 1494, 1498 [title obtained by trustee's deed on foreclosure relates back to execution of trust deed]; *Sain v. Silvestre* (1978) 78 Cal.App.3d 461, 471 [purchaser at foreclosure acquired title free of equitable servitudes recorded after recording of trust deed]; 4 Witkin, Summary of Cal. Law (10th ed. 2005) Security Transactions in Real Property, § 169, p. 970 ["On the trustee's sale of the property [following foreclosure], the purchaser acquires the trustor's interest in the property as of the date that the deed of trust was originally executed"].)

Alevy's 1988 trust deed encumbered Lot 20 before Pico Union's adverse possession began, and Pico Union's subsequent possession of Lot 20 was not hostile to Alevy's lienhold interest. (12 Witkin, Summary, *supra*, Real Property, § 1217, pp. 275-276 [possession is not hostile to rights of mortgagee until delivery of deed upon foreclosure]; 4 Witkin, Summary, *supra*, Security Transactions in Real Property, § 170, p. 971; *Comstock v. Finn*, *supra*, 13 Cal.App.2d at p. 157.) The title Alevy obtained in 2002 arose from his right to foreclose on the owner's interests when they granted the trust deed in 1988, not from succession to the interest they held after they had ceded their possessory rights to Pico Union.

This result does not contradict the early decision of our Supreme Court in *Le Roy v. Rogers* (1866) 30 Cal. 229 (*Le Roy*), as Pico Union contends it does. In *Le Roy*, the plaintiffs' assignor, Leese, had obtained title to the property by patent in March 1858.

19

Leese mortgaged the property to Vallejo; the mortgage was foreclosed in 1860; and title to the property was conveyed to Vallejo's assignees in 1862. In the meantime, from 1858 until January 1864, Rogers' grantors (along with others) were in adverse possession of the property. As of March 1858, Leese therefore had a right to oust Rogers from possession. "The Statute of Limitations, therefore, commenced to run at that date, and the plaintiffs' action, which was commenced in August, 1864, was barred, unless something has intervened to prevent the running of the statute." (*Le Roy*, *supra*, 30 Cal. at p. 233.)

The key holding of the *Le Roy* decision is that the title the plaintiffs obtained by grant is no greater than the interest of their grantor at the time of the grant—a principle that is wholly consistent with that affirmed in this case. On that basis the court held in *Le Roy* that Rogers' adverse possession of the property was unaffected by an intervening action to which Rogers was not a party, in which Leese's assignees had sought and obtained judgment for possession as against others. As purchasers at a foreclosure sale, Leese's assignees obtained "the estate that the mortgagor had," as though "the mortgaged premises been conveyed directly by the mortgagor, instead of indirectly and through the operation of a judicial sale. He does not differ in this respect from one who purchases at an official sale, made in satisfaction of a judgment lien." (*Id*. at p. 236.)

Pico Union contends that the *Le Roy* decision stands for the proposition that the interest obtained by an adverse possessor (in that case, Rogers) is unaffected by a sale of the property upon foreclosure of a mortgage. But *Le Roy* did not decide that proposition. In *Le Roy*, the period of adverse possession apparently had commenced before Leese's mortgage to Vallejo; nothing in the decision indicates otherwise. Consistent with that case (and with the case at hand), the lien granted after the adverse possession had commenced did not break the period of adverse possession, and did not affect the title obtained by it.

The rule of the *Le Roy* decision thus is that the interest obtained by the adverse possessor is no greater than that held by the title owner when the adverse possession commenced; and by the same token, the title obtained by purchase at a foreclosure sale is

20

the interest held by the owner when the property was encumbered. (*Le Roy*, *supra*, 20 Cal. at p. 235 [prescriptive period accrues against title as of commencement of prescriptive period]; *Sevier v. Locher*, *supra*, 222 Cal.App.3d at p. 1085 [same].) Here, title to Lot 20 was encumbered by a lien when Pico Union's adverse possession commenced in 1995; the title resulting from Pico Union's adverse possession therefore was subject to the same preexisting encumbrance.

### 3. The title resulting from Alevy's 2002 foreclosure superseded the title Pico Union had earlier obtained by adverse possession.

When Alevy foreclosed on his 1988 trust deed in 2002, all junior encumbrances were eliminated. (*Metropolis Trust & Sav. Bank v. Barnet* (1913) 165 Cal. 449, 455 [sale of property upon foreclosure of trust deed extinguishes mechanic's lien filed after trust deed's execution, vesting absolute title in purchaser at foreclosure sale]; *Ferry v. Fisk* (1921) 54 Cal.App. 763 [purchaser at sale under deed of trust becomes owner of the property free from lien of all subsequent encumbrances]; Civ. Code, § 2903 [person with interest in property subject to a lien may redeem it from the lien, until the right of redemption is foreclosed]; 4 Witkin, Summary, *supra*, Security Transactions in Real Property, § 213, p. 1031.)

Alevy's delay until 2002 in exercising his power of sale, and until 2009 in seeking quiet title to Lot 20, could not give rise to an untimeliness defense. The lien of a deed of trust remains enforceable by a power of sale until 60 years after recordation of the trust deed, unless the final maturity date or last date fixed for payment of the debt can be ascertained from a recorded document (not apparent in this case). (Civ. Code, § 883.020, subd. (a); *Nicolopulos v. Superior Court* (2003) 106 Cal.App.4th 304, 310.) Alevy therefore apparently had until the year 2048 to exercise and enforce the power of sale in his 1988 trust deed. Nor could the doctrine of laches be applied, particularly where Pico Union apparently could claim no prejudice apart from having to discharge the outstanding debt that the lien secured. (*Id.* at p. 312.)

The 1988 trustee's deed recites that all required notices of default and sale were duly given, and other documents indicate that Pico Union had notice that Alevy was

exercising his power of sale with respect to Lot 20. But in any event, a trustee's sale may be voidable for a defect in notice only if payment of the secured debt is tendered. (*Leonard v. Bank of America* (1936) 16 Cal.App.2d 341, 346; 4 Witkin, Summary, *supra*, Security Transactions in Real Property, § 152, p. 950.)[10]

Until Alevy purchased title at the foreclosure sale, Pico Union had the right to redeem Lot 20 from Alevy's lien. (Civ. Code, § 2903.) But Alevy's acquisition of the property by trustee's deed upon his power of sale eliminated Pico Union's right to claim title to Lot 20 by virtue of its earlier-perfected adverse possession.

## B. The Trial Court's Determination That Lot 20 Is Not Burdened By An Implied Easement Cannot Be Sustained.

Pico Union contends that even without adverse possession, an easement for the continued use of Lot 20 as a parking lot for the benefit of Lot 22's tenants arose by implication, by virtue of the parcels' long, obvious, and apparently permanent use by their common owners in that manner before the parcels' ownership diverged. The trial court rejected that claim.

The circumstances under which the law implies the existence of such an easement are set forth in Civil Code section 1104: "A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed." This provision "creates an implied easement as an exception to the general rule that interests in real property can only be created by an express writing or by prescription [citations]." (*Kytasty v. Godwin* (1980) 102 Cal.App.3d 762, 768-769.)

---

[10] At trial Alevy could not recall whether a writing evidenced the 1988 loan secured by his trust deed on both parcels (though he believed a writing must have existed), and he had no record of the loan's amount nor record or recollection of its terms. He alleged that the unpaid balance as of October 2002 was $978,000 principal and interest. He purchased Lot 20 with a foreclosure bid of $20,000.

'"When the owner of lands divides his property into two parts, granting away one of them, he is taken by implication to include in his grant all such easements in the remaining part as are necessary for the reasonable enjoyment of the part which he grants, in the form which it assumes at the time he transfers it. The purchaser is entitled to the benefit of the easement without any express grant or reservation."' (*A. Hamburger & Sons, Inc. v. Lemboeck* (1937) 20 Cal.App.2d 565, 569.) '"If the owner's use of the "quasi servient tenement" has continued for a period of time in an obvious and permanent manner, a division of his title implies that the parties intended to transfer the obvious burdens and benefits with the property conveyed. Therefore, if the owner conveys the "quasi dominant tenement," the grantee receives an implied easement for the use and benefit of his property over the "quasi servient tenement" retained by the owner-grantor."' (*Horowitz v. Noble* (1978) 79 Cal.App.3d 120, 131-132.) '"The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing, to change materially the relative value of the respective parts."' (*Id.* at p. 132.)

The law will imply the existence of an easement when the following conditions exist: First, there has been a divergence of title to properties or portions of a property that were under common ownership. Second, before the divergence in ownership, the common owner of both parcels or portions of the property had made such obvious and apparently permanent use of one portion for the benefit of the other, such that the parties to the transaction must have known and intended or believed that its use in that manner would continue after the divergence in the parcels' ownership. Third, the easement that is implied from these circumstances—for the continued use of one portion of the property for the benefit of the other—is reasonably necessary to the use and benefit of the portion that is claimed to be the dominant tenement. (*Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 141.)

The trial court concluded that Pico Union's claim to an implied easement was defeated by Alevy's claimed placement of plaques on Lot 20, stating "I think plaintiff's contention of an implied easement is barred by Civil Code section 1008," and "I think

23

placement of the plaques defeats any claim of an implied easement. Its statement of decision expressed a number of additional grounds for rejection of the implied easement theory. It concluded that because the common ownership of Lots 20 and 22 had diverged in December 1988, when the CRA foreclosed on its lien on Lot 22, "it is impossible to say that the owners 'intended' to grant [the CRA] an easement" for Lot 20's use as a parking lot. It found also that because the Lot 22 apartments had been vacant for about two years during the properties' restoration after the CRA's late-1988 acquisition of title, "the 'dominant' Lot 22 estate did not continue its parking use for a significant period of time" after the divergence in the parcels' ownership. And the court found that the use of Lot 20 as a parking lot "was never 'reasonably necessary' to use of the Apartments," as evidenced by the break in use as a parking lot during the properties' restoration and the fact that there were fewer parking spaces on Lot 20 than apartments on Lot 22. But "[i]n particular," the court explained, Pico Union's claim to an implied easement is defeated because "the installation of the plaques at the subject property along with the owners' consent to use the property defeats all claims for an easement."

We conclude that the trial court's rulings on this issue cannot be sustained. We reverse the trial court's rejection of the implied easement claim, not because the evidence necessarily establishes the existence of an implied easement, but because the court's rejection of that theory rests on erroneous rulings and assumptions, requiring redetermination of the issue.

The following is the relevant sequence of events:

In May 1986, the Community Development Fund (CDF) loaned $877,943.05 to the owners of Lots 20 and 22, for the properties' rehabilitation and restoration. As a

24

result of error, the encumbrance securing that loan was mistakenly placed only on Lot 22, but not on Lot 20.[11]

Throughout that period (and since much earlier) the lots had been commonly owned, and Lot 20 had been used as a parking lot for tenants of Lot 22. As of June 1988, both Lot 20 and Lot 22 were owned by a group consisting of eight individuals and a corporation.[12] At that time, Alevy loaned $400,000 to the owners group, receiving a trust deed encumbering both lots and taking over management of the properties' ongoing restoration.[13]

Alevy was unable to complete the Lot 22 apartments' rehabilitation, however. In December 1988, the CDF took title to Lot 22 by foreclosure, later transferring title to the CRA. Title to Lot 20 remained in the ownership group, subject to Alevy's mid-1988 lien; Alevy's encumbrance on Lot 22 was extinguished by the CRA's foreclosure on its senior lien. The CRA transferred Lot 22 to Pico Union in January 1992, after completing

---

[11] In 1981, the Yacoobians apparently had failed to properly document their intention to transfer title to both parcels to the ownership group. The Yacoobians corrected that mistake in February 1988, when they recorded a deed confirming their earlier intention to include Lot 20 in the transfer, and quitclaiming Lot 20 to the ownership group. Alevy confirmed that the failure of the CRA's lien to encumber Lot 20 was a mistake.

[12] During the period from 1981 to 1988 the membership of the ownership group changed somewhat, in ways not relevant here. For a very brief period during 1988 Alevy had caused the properties' ownership to be transferred to a nonprofit religious congregation in exchange for his contract to provide management services, but he soon transferred title back to the ownership group in order to spare that organization the problems arising from the properties' troubled rehabilitation. Alevy had formed the corporation that held an interest of about one-third in the ownership group as of June 1988, which was owned by his daughter, employed his wife and secretary, and on whose Board his grandson sat. Alevy had a contract for exclusive management of the properties on behalf of the ownership group.

[13] Alevy's May 1988 trust deed encumbering both parcels therefore was in at least third position as to Lot 22 (junior to the CRA's 1986 trust deed and the earlier Weingart Foundation lien on both lots); but his lien on Lot 20 apparently was in second position, junior only to the Weingart Foundation trust deed.

the rehabilitation and restoration of both properties for use as apartments, and adjoining parking, for low-income tenants.

The trial court reasoned that, because the divergence in title had resulted from foreclosure of the 1986 trust deed (which encumbered only Lot 22), it would be "impossible" to conclude that the parties had intended that Lot 20 would continue to be used as a parking lot for the use of Lot 22's tenants. But the fact that the divergence ownership resulted from foreclosure rather than voluntary conveyance does not preclude the implication of an easement when the circumstances identified in Civil Code section 1104 exist.

Civil Code section 1104 defines the conditions that give rise to an implication of the parties' intention that the land be subject to a servitude, even when such an intention is not expressed. (*Kytasty v. Godwin*, *supra*, 102 Cal.App.3d at pp. 768-769.) Here, Lot 20 had long been used by the parcels' common owners as a parking lot for the benefit of the tenants of the Lot 22 apartments. The record contains no indication that anyone— either the owners or Alevy—had any intention that the use of Lot 20 as a servient or quasi-servient tenement should or would change in the foreseeable future, or that Lot 20 would (or could) be devoted to any other appropriate use.

An easement that is appurtenant to the land but is unmentioned in a conveyance can nevertheless burden a property when it is conveyed. "A purchaser of property is bound to take notice of all easements or servitudes which are 'apparent' upon inspection of the property." (*Kytasty v. M.F. Goodwin*, *supra*, 102 Cal.App.3d at p. 771.) "The implied easement or quasi-easement authorized by Civil Code section 1104 is reciprocal; hence, if a burden has been imposed upon a parcel of land sold, the purchaser, provided the marks of this burden are open and visible, takes the property with the servitude on it [citations]." (*Id.* at p. 770; *Horowitz v. Noble*, *supra*, 79 Cal.App.3d at p. 133 [purchaser takes title subject to obvious benefits and burdens].)

That principle applies to one who obtains an encumbrance on property no less than to one who purchases title outright. When Alevy obtained trust deeds encumbering Lots 20 and 22, he was the properties' exclusive manager and was aware of Lot 20's use as a

26

parking lot for use by the Lot 22 tenants. To the extent these known circumstances give rise to an implied easement appurtenant to the property, the trust deed he obtained in mid-1988 therefore was a lien on "the property with the servitude on it." (*Kytasty v. M.F. Goodwin*, *supra*, 102 Cal.App.3d at p. 770.)

The same is true when the CRA encumbered Lot 22 in 1986. The obvious and apparently permanent use to which the parcels had long been put by their common owners was sufficient to indicate that appurtenant to Lot 22 was a quasi-easement for Lot 20's use as a parking lot—a servient tenement to which a purchaser at foreclosure would be entitled. (*A. Hamburger & Sons v. Lemboeck*, *supra*, 20 Cal.App.2d at p. 568 [purchaser of dominant tenement at foreclosure sale acquires implied easements on property]; see also *Bartholomae Corp. v. Scott W.B. Inv. Co.* (1953) 119 Cal.App.2d 41, 44 [transfer of interest in property passes all easements, unless expressly excepted]; *St. Louis v. DeBon* (1962) 204 Cal.App.2d 464, 466 [Easement that is appurtenant to the property will pass with land conveyed without specific mention]; Civ. Code, § 2926 [mortgage "is a lien upon everything that would pass by a grant of the property"]; 4 Witkin, Summary of Cal. Law (10th ed. 2005) Security Transactions in Real Property, § 169, p. 970 ["On the trustee's sale of the property [following foreclosure], the purchaser acquires the trustor's interest in the property as of the date that the deed of trust was originally executed"].)

This treatment of appurtenant easements is consistent with the manner in which the law treats leasehold interests and fixtures that are appurtenant to mortgaged property. In *Trask v. Moore* (1944) 24 Cal.2d 365, 368, for example, the plaintiff had a trust deed encumbering four parcels of property, including "all appurtenances including water rights." (*Id.* at p. 367.) Following the placement of this encumbrance, the properties and water rights were sold to others, who disconnected the water distribution system and redirected the water from the properties' pumps to other property. Upon the plaintiff's foreclosure, the Supreme Court affirmed the trial court's order that the defendants reconnect the water distribution system, holding that the system had functioned as part of an integrated system when the plaintiff had received its encumbrance on the lots. "By

being so joined and essential to the function of the apparatus as a whole, the distributing system contained and combined in itself all of the elements and attributes of a fixture or appurtenance to real estate." (*Id.* at p. 368; see Civ. Code, § 663 ["A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit . . . ."].) As such, the distributing system passed with the encumbered parcels. (See also *San Francisco Breweries v. Schurtz* (1894) 104 Cal. 420, 426-427 [fixtures in place when leased property is mortgaged are subject to sale upon the mortgage's foreclosure].)

Formal title to both Lot 20 and Lot 22 remained in the ownership group until late 1988; however it was in 1986, before Alevy's lien on the properties, that the ownership group conveyed to the CRA an interest in Lot 22—a conveyance that arguably carried with it a quasi-easement burdening Lot 20's use. (Civ. Code, § 2926; *U.S. v. Real Property at 2659 Roundhill Dr., Alamo, Cal.* (9th Cir. 1999) 194 F.3d 1020, 1026 [Under California law, interest of purchaser at foreclosure proceeding relates back to time the deed of trust was recorded]; see *Hohn v. Riverside County Flood Control and Water Conservation Dist.* (1964) 228 Cal.App.2d 605, 613; Miller & Starr, Cal. Real Property, Deeds of Trust, § 10:208, pp. 665-666 [purchaser at foreclosure sale has same priority as trust deed].)[14]

---

[14] This is analogous to the principle that an easement appurtenant to property is not extinguished by merger when title to the dominant and servient tenements are acquired by common owners, if the two parcels are subject to unequal nonpossessory interests. (*Zanelli v. McGrath* (2008) 166 Cal.App.4th 615, 628-629 [easement is not extinguished by merger if the estates in dominant and servient tenements, although acquired by one person or group, are such that one may terminate before the other].) That was the situation with respect to Lots 20 and 22 from 1986 through 1988, when the ownership group held title to both parcels, but the parcels' encumbrances were such that its ownership of one parcel might terminate before its ownership of the other (as eventually was the case). Under the reasoning of *Zanelli v. McGrath, supra,* the differing encumbrances burdening Lots 20 and 22 after 1986 would have been sufficient to prevent the easement from being extinguished, notwithstanding the ownership group's title to both.

It is on this basis that we conclude that the divergence in title between Lots 20 and 22 is a sufficient basis for the implication of an easement, entitling Lot 22 "to use other real property of the person whose estate is transferred [i.e., Lot 20] in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred [the ownership group], for the benefit [of Lot 22], at the time when the transfer was agreed upon [i.e., when it was encumbered in 1986] or completed [when the trust deed was foreclosed in late 1988]." (Civ. Code, § 1104.)[15]

The trial court's ruling that Pico Union's claim of an implied easement was defeated by the evidence that Alevy had consented to its use of Lot 20 as a parking lot for Lot 22's tenants is fatally infected by its express reliance for that conclusion on the erroneously admitted evidence of Alevy's compliance with Civil Code section 1008 and his consent to Pico Union's use of Lot 20. Civil Code section 1008 applies to the creation of easements by prescription; it does not purport to apply to easements that arise by implication under Civil Code section 1104. Moreover, even if the evidence of Alevy's purported consent had been admissible and could be credited, it could not defeat the existence of the implied easement sought here, because consent by the servient-tenement owner to the dominant tenement's use of his property consistent with an existing easement—especially consent that comes years after the easement's creation (whether by express conveyance or by implication)—could not defeat the easement's existence.

If an implied easement arose at all, it arose when the interests in Lots 20 and 22 diverged, leading to ownership of Lot 20 by Alevy and ownership of Lot 22 by Pico Union. That divergence of interests began in 1986 with the CRA's acquisition of an encumbrance on Lot 22, and culminated in 1988 with its acquisition of title to Lot 22 by foreclosure. Therefore any implied easement that might exist would have arisen in the late 1980's, years before any consent was given or plaques were placed.

---

[15] Following submission of the case for decision in this court, the parties filed letter-briefs at our request, addressing the timing and significance of the divergence of title to the parcels.

The court's statement of decision, prepared by counsel for Alevy, recites that the claimed implied easement on Lot 20 was not reasonably necessary to Lot 22's beneficial use. However, the court had earlier made clear its conclusion that the implied easement claim was not viable, based solely on evidence that Alevy had consented to Lot 20's use as a parking lot. For example, the court interrupted the cross-examination of Alevy on another subject to interpose, that "the critical issue is, as I said earlier," whether Alevy consented to the use of Lot 20 as a parking lot. During the parties' closing arguments the court repeated its conclusion that any implied easement would be barred by Alevy's subsequent grant of permission to use Lot 20: "I think [Pico Union's] contention of an implied easement is barred by Civil Code section 1008." "Let me make it clear. I don't think this implied easement claim can survive on the property." The court later told counsel that it believed that the placement of plaques pursuant to Civil Code section 1008 defeats Pico Union's claim for "a prescriptive implied easement." "If these plaques were to defeat basically an expressed easement [pursuant to Civil Code section 1008], they should certainly defeat [an] implied easement as well." When counsel for Pico Union argued that an implied easement is a "different animal" from a prescriptive easement, the court responded that "I understand your point. I just disagree with you."

At the close of argument, the court announced that "I am ready to rule," saying it would rule in Alevy's favor based on the evidence that he had given permission for Lot 20's use as a parking lot and had had plaques complying with Civil Code section 1008 placed on the property. It stated its conclusion that "I think placement of plaques defeats any claim of an implied easement," as well as defeating the hostility requirement for adverse possession. It then directed Alevy's counsel to prepare the statement of decision, which it signed as submitted.

The court clearly and repeatedly expressed its unequivocal conclusion that the evidence of Alevy's consent to use Lot 20 as a parking lot precluded a determination in Pico Union's favor on the implied easement issue. In light of the court's express acknowledgement of the determinative influence of that erroneously admitted evidence on its rejection of the implied easement claim (without regard to any merit the claim

30

might otherwise have), we cannot exclude the likelihood that its ruling on that issue was influenced by the error. Accordingly, we reverse the judgment with respect to the implied easement claim, permitting its determination free from the influence of the erroneously admitted evidence.

## CONCLUSION

The evidence shows without contradiction that although Pico Union's right to title to Lot 20 by adverse possession for the statutory period had vested, its right to title remained encumbered by Alevy's earlier lien, and was eliminated when Alevy foreclosed on his encumbrance. Nevertheless, the trial court erred in rejecting Pico Union's claim to an implied easement on Lot 20 for its use as a parking lot for Lot 22's tenants, based on its reliance on erroneously admitted evidence.[16]

## DISPOSITION

The judgment in favor of Alevy with respect to adverse possession is affirmed. The judgment with respect to Pico Union's claim to an implied easement on Lot 20 is reversed. Pico Union to recover costs.

NOT TO BE PUBLISHED.


CHANEY, J.


I concur:



MALLANO, P. J.

---

[16] Because Pico Union's opening brief fails to address the trial court's rejection of its alternative contentions, that it was entitled to either a prescriptive easement or an equitable easement for use of Lot 20, we decline to review those issues here. (*Kelly v. CB&I Constructors, Inc.* (2009) 179 Cal.App.4th 442, 451-452 [disregard issues not addressed in opening brief].)

Rothschild, J., concurring and dissenting:

I agree that the superior court correctly rejected Pico Union's adverse possession claim, but I respectfully dissent from the majority's treatment of the implied easement. I do not believe that the court's admission of evidence of the placement of plaques on Lot 20 warrants reversal of the court's determination of the implied easement claim, because the court did not rely on that evidence in its analysis of the implied easement. In addition, the court concluded that no implied easement for parking on Lot 20 was ever created because no such easement was reasonably necessary for the use and benefit of Lot 22. That is a factual determination and consequently is subject to substantial evidence review. (*Leonard v. Haydon* (1980) 110 Cal.App.3d 263, 274.) Lot 22 has 60 apartments, and the 22 parking spaces on Lot 20 serve only a small subset of the residents of those 60 apartments, namely, those who choose and can afford to lease a parking space on Lot 20. I conclude that substantial evidence supports the superior court's determination that the implied easement was not reasonably necessary and thus was never created. I would therefore affirm the judgment in its entirety.


ROTHSCHILD, J.