Filed 4/2/14  Lovell v. Fong CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>
GLENDA LOVELL,<br><br>
      Plaintiff and Appellant,<br><br>
v.<br><br>
STANLEY FONG et al.,<br><br>
      Defendants and Respondents.
</td><td>
A139309<br><br>
(Alameda County<br>
Super. Ct. No. HG 11601714)
</td></tr>
</table>

Stanley and Sofia Fong (the Fongs) purchased an undeveloped lot at 1836 Weir Drive (subject property) in Hayward, California.  Ben Li Qiu, a construction contractor, purchased the neighboring lot at 1842 Weir Drive (adjacent property).  The Fongs engaged Qiu to build a home on the subject property and Qiu simultaneously built another home on the adjacent property.

Glenda Lovell purchased the subject property from the Fongs.  A little more than five years after the sale, an engineer reported that Lovell's home suffered from significant structural defects.  Lovell sued the Fongs and Qiu, alleging that they were "builders," as defined in Civil Code[1] section 911, and liable to her for violation of building standards set forth in section 896.  Lovell also sued Qiu alone for breach of an express warranty.

The Fongs and Qiu separately moved for summary judgment or, in the alternative, summary adjudication.  The trial court determined that there were no triable issues of material fact, granted both motions, and entered judgment in favor of the Fongs and Qiu.

---

[1]  Unless otherwise indicated, statutory references are to the Civil Code.

1

The court ruled that: (1) neither the Fongs nor Qiu were "builders" and (2) Lovell's complaint did not, as Lovell argued, encompass liability under a negligence theory or liability for breach of an express warranty different from that identified in the complaint. On appeal, Lovell asserts that there were triable issues of fact for both of her causes of action. Lovell also contends that the court should have granted her leave to amend her complaint.

Following de novo review, we conclude, in agreement with the trial court, that there were no triable issues of fact with respect to whether the Fongs or Qiu were "builders" or whether Qiu had breached the express warranty identified in Lovell's complaint. We also conclude that Lovell did not raise triable issues of fact with her arguments concerning negligence and a different express warranty because these were not issues framed by her complaint. Finally we conclude that Lovell was not denied an opportunity to amend her complaint. Rather, she failed to request it. The judgment is affirmed.

## BACKGROUND

### I. *Factual Background*

We state the material facts for which evidence was presented by the parties in support of, and in opposition to, the motions for summary judgment. Unless otherwise noted, the facts are undisputed.

Stanley Fong is self-employed as a dentist and has worked full-time as a dentist since 1975.[2] Sofia Fong is licensed as a real estate salesperson and works part-time as an agent for business buyers and sellers of commercial properties. The Fongs purchased the subject property in May 2003.

---

[2] Lovell disputed Stanley's statement that he worked full-time as a dentist because he is a licensed as a real estate broker in California and his license record at the Department of Real Estate indicates that he has done business as a broker since 2002. However, Lovell presented no evidence that Stanley's activity as a real estate broker was more than incidental, although he did act as a broker in the sale of the subject property to Lovell.

2

Qiu is licensed as a general contractor in California and does business as Stereo Construction. The Fongs contracted with Qiu to build a home on the subject property.[3]

Also in May 2003, Qiu purchased the adjacent property. Sofia acted as Qiu's real estate agent in the purchase. The Fongs loaned Qiu $140,700 so that he could purchase the property.

On December 30, 2003, Qiu provided a construction proposal to the Fongs for the subject property showing a total cost of $400,000 and providing time estimates. Beyond this proposal, there was no written contract between Qiu and the Fongs. Sofia stated in her deposition that because Qiu did not speak English and because the Fongs trusted Qiu, no contract was needed.

Qiu began construction on the subject property and about 20 days later began construction on the adjacent property.[4] The same architect and engineer were used for both properties. On January 28, 2004, Sofia and Qiu together obtained a commercial general liability insurance policy, covering both properties. The Fongs obtained a loan in the amount of $554,500 for construction on the subject property. Qiu, with help provided by Sofia as a translator, obtained a separate loan of $476,000 for construction on the adjacent property.

Lovell began negotiating with the Fongs for the purchase of the subject property in June 2005. As part of this negotiation, she requested warranties from the contractor on June 4, 2005. On June 6, 2005, Qiu gave the Fongs a letter that stated: "Dear New Owner: [¶] Re: 1836 Weir Dr. Hayward, CA 94541 [¶] This is to certify that I will warranty the roof, attached fixtures, foundation and walls against structural defects for a period of five years from the date of close of escrow. [¶] Please contact me if you have any questions."

_____

[3] Lovell disputes that Qiu built the residence on the subject property as a contractor. She portrays the relationship between the Fongs and Qiu as a joint venture to build and sell houses on two lots for sale to the public. Whether the facts support such an inference is an issue we address below.

[4] The record does not provide a date on which construction on the subject property commenced.

3

Between June 13, 2005 and July 11, 2005, Lovell, the Fongs, and Qiu all signed a document titled "New Building Structural Construction Warranty" for the subject property. This document states: "Stereo Construction owned by Ben Li Qiu . . . should provide a building structure warranty including roof, plumbing, electrical, attached fixtures, foundation & walls against structural defect per SB 800[5] Subchapter 722 which specified the terms of warranties covered. The homeowner reserves the protection and rights and requirements of a homeowner to bring action for construction defects provided by SB 800 subchapter 722."

Lovell's purchase of the subject property for $900,000 was completed on August 17, 2005, the day on which a notice of completion was filed. Qiu later sold the adjacent property for around $800,000.

Lovell received an inspection report, dated August 29, 2010. Lovell alleged in her complaint that the residence constructed on the subject property suffered from significant structural defects.[6] On September 13, 2010, Lovell served the report on the Fongs and Qiu.

## II. *Procedural Background*

On October 26, 2011, Lovell filed a complaint naming the Fongs and Qiu as defendants and stating two causes of action. The first cause of action was against all defendants and was titled "Violation of Construction Standards Set Forth in Civil Code Section 896." In connection with this cause of action, Lovell alleged that (1) all defendants were "builders," within the definition of section 911, of 1836 Weir Drive; (2) construction of the subject property violated the construction standards of section 896; and (3) Lovell had invoked the pre-litigation procedures specified in sections 910 through 938, but had terminated the process "[a]fter a year of fruitless exchange and discussion."

---

[5] "SB 800" refers to Senate Bill No. 800 (2001-2002 Reg. Sess.), also known as the Right to Repair Act, which we discuss below.

[6] The report itself is not in the record before us because none of the parties raised the actual existence of structural defects as a material disputed issue during summary judgment proceedings.

4

The second cause of action was against Qiu alone for breach of an express warranty.  In connection with this cause of action, Lovell alleged that (1) in his June 6, 2005 letter, Qiu had provided a warranty for five years from the close of escrow; (2) escrow closed on August 17, 2005; and (3) an engineer inspected the subject property on August 14, 2010 and found significant structural defects.[7]

For both causes of action, Lovell did not claim actual damages but sought $203,374 "[f]or reasonable repair costs and related expenses."

Qiu and the Fongs filed separate motions for summary judgment or, in the alternative, for summary adjudication on January 24 and February 27, 2013, respectively. Lovell opposed both motions.

On May 17, 2013, the court held a hearing and granted summary judgment to Qiu and the Fongs.  Defendants' counsel were ordered to submit proposed judgments.  On June 5, 2013, Lovell raised objections to the proposed judgments.[8]  On June 24, 2013, the court entered final judgment in favor of the Fongs and Qiu.

Lovell timely filed a notice of appeal on July 23, 2013.

## DISCUSSION

### I. *Standard of Review*

We review a grant of summary judgment de novo, "considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.  We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 388-389.)

"First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of

---

[7] The second cause of action incorporated earlier paragraphs 8 and 9, which alleged that the engineer's report was dated August 29, 2010 and that the report was served on the Fongs and Qiu on September 13, 2010.

[8] The proposed judgments submitted by the Fongs and Qiu are not in the record before us.

5

material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. (See Evid. Code, § 500.) There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . . [A] plaintiff bears the burden of persuasion that 'each element of' the 'cause of action' in question has been 'proved,' and hence that 'there is no defense' thereto. [Citation.] A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. [Citation.]

"Second, and generally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851, fns. omitted; see also Code Civ. Proc., § 437c, subd. (p).)

## II. *Legal Background*

### A. *Common Law Strict Liability for New Construction*

In *Pollard v. Saxe & Yolles Dev. Co.* (1974) 12 Cal.3d 374, our Supreme Court held for the first time that "builders and sellers of new construction should be held to what is impliedly represented—that the completed structure was designed and constructed in a reasonably workmanlike manner." (*Id.* at p. 380, fn. omitted.) Following *Pollard*, strict liability for construction flaws has been available in California for "mass producers"[9] of residences, whether individual tract homes or multi-unit

---

[9] In *Fleck v. Bollinger Home Corp.* (1997) 54 Cal.App.4th 926, 935, the court held that the "trial court did not abuse its discretion in deciding to use the phrase 'substantial numbers' in lieu of the word 'mass.' The phrase accurately defines the

6

complexes. In *Del Mar Beach Club Owners Assn. v. Imperial Contracting Co.* (1981) 123 Cal.App.3d 898 (*Del Mar*), for example, the defendants constructed and marketed 192 residential units. (*Id.* at p. 912.) The court found that "the inference that [defendants] were engaged *in the business* of developing and selling residential units, rather than merely being occasional sellers who are not engaged in that activity as part of a business venture, is inevitable" and determined that strict liability applied. (*Id.* at pp. 912-913, italics added.)

However, in *Oliver v. Superior Court* (1989) 211 Cal.App.3d 86 (*Oliver*), the court refused to extend strict liability to those who might build and sell a residence on an isolated or occasional basis: "[W]e find no case law supporting imposition of strict liability on other than 'mass-produced' homes. Whether a residence falls within a category of a mass-produced home is a question which must be determined on a case-by-case basis. Here, [the seller] built two homes, at two different times, in two different locations. Such building is reflective of occasional construction, not mass production." (*Id.* at p. 89.) The *Oliver* court distinguished between "occasional sellers of residential units" and those who "were *in the business* of developing and selling them" and explained: "A home purchase through an occasional construction and sale does not involve the buyer reliance attending sales based upon an advertised model. Nor does it present a situation where the builder may protect himself from substantial financial loss by effectively spreading both the risk and actual costs of defective construction among a number of residences in a development." (*Id.* at pp. 88, 89, italics added.)

Further, common law strict liability claims are limited to plaintiffs who have suffered actual damages. In *Aas v. Superior Court* (2000) 24 Cal.4th 627, 632 (*Aas*), the court held that homeowners could not recover damages for construction defects in tort actions unless the defects had already resulted in property damage.

---

predicate for strict liability in tort here." In *Fleck*, the defendant had built and sold 11 homes to the general public between 1984 and 1989. (*Ibid.*)

7

**B.** *The Right to Repair Act*

In response to the holding in *Aas*, the California Legislature enacted the Right to Repair Act in 2002 (the Act). (*Greystone Homes, Inc. v. Midtec, Inc.* (2008) 168 Cal.App.4th 1194, 1202; Sen. Bill No. 800 (2001-2002 Reg. Sess.).) Goals of the Act included abrogation of the holding in *Aas* and reduction of the costs associated with construction defect litigation: "This bill would make major changes to the substance and process of the law governing construction defects. It is the product of extended negotiations between various interested parties. Among other things, the bill seeks to respond to concerns expressed by builders and insurers over the costs associated with construction defect litigation, as well as concerns expressed by homeowners and their advocates over the effects of a recent Supreme Court decision that held that defects must cause actual damage prior to being actionable in tort . . . . [¶] . . . [¶] [E]xcept where explicitly specified otherwise, liability would accrue under the standards regardless of whether the violation of the standard had resulted in actual damage or injury. As a result, the standards would essentially overrule the *Aas* decision and, for most defects, eliminate that decision's holding that construction defects must cause actual damage or injury prior to being actionable. Also, as noted by the Assembly Judiciary Committee analysis: 'Rather than requiring resort to contentions about the significance of technical deviations from building codes, the bill specifies the standards that building systems and components must meet.' " (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 800 (2001-2002 Reg. Sess.) as amended Aug. 28, 2002, pp. 1, 4, italics added.)

The Act imposes strict liability on "builders," as defined in section 911, and is organized in the following manner: "Chapter 2 of the Act . . . sets out building standards, the violation of which constitutes a deficiency in construction for which the builder may be held liable to the homeowner. (§§ 896, 897) Chapter 3 of the Act imposes obligations on the builder, including an obligation to furnish an express limited warranty. (§§ 900-907.) Chapter 4 of the Act . . . prescribes nonadversarial prelitigation procedures a homeowner must initiate prior to bringing a civil action against the builder seeking recovery for alleged construction deficiencies. (§§ 910-938.) Chapter 5 of the Act sets

8

out the applicable statute of limitations, the burden of proof, the damages that may be recovered, and the affirmative defenses that may be asserted; it also makes the Act binding on successors-in-interest of the original home purchaser.  (§§ 941-945.5.)" (*Baeza v. Superior Court* (2011) 201 Cal.App.4th 1214, 1222-1223.)

Section 911 originally defined "builder" to mean "a builder, developer, or original seller."  (Stats. 2002, ch. 722, § 3, p. 4257.)  However, in 2003 the Legislature amended section 911, to provide:  "(a)  For purposes of this title, except as provided in subdivision (b), 'builder' means any entity or individual, including, but not limited to a builder, developer, general contractor, contractor, or original seller, who, at the time of sale, was also in the business of selling residential units to the public for the property that is the subject of the homeowner's claim or was in the business of building, developing, or constructing residential units for public purchase for the property that is the subject of the homeowner's claim.  [¶]  (b)  For the purposes of this title, 'builder' does not include any entity or individual whose involvement with a residential unit that is the subject of the homeowner's claim is limited to his or her capacity as general contractor or contractor and who is not a partner, member of, subsidiary of, or otherwise similarly affiliated with the builder.  For purposes of this title, these nonaffiliated general contractors and nonaffiliated contractors shall be treated the same as subcontractors, material suppliers, individual product manufacturers, and design professionals."  (Stats. 2003, ch. 762, § 2, p. 5729; Assem. Bill No. 903, approved by Governor, Oct. 10, 2003, (2003-2004 Reg. Sess.) § 2.)

The standards established by the Act also apply "to general contractors, subcontractors, material suppliers, individual product manufacturers, and design professionals to the extent that the general contractors, subcontractors, material suppliers, individual product manufacturers, and design professionals caused, in whole or in part, a violation of a particular standard as a result of a negligent act or omission or a breach of contract."  (§ 936.)

**III.** *The Defendants were not "Builders" under Section 911*

**A.** *The Fongs were not "Builders"*

The Fongs were named as defendants only in Lovell's first cause of action, which alleged that the Fongs were liable as "builders" under the Act. Lovell contends that there is a triable issue regarding whether the Fongs are "builders." Lovell first argues that even though the Fongs only sold a single new residence, they were nonetheless "builders" under section 911 and we examine that contention in this part. Lovell also argues that the Fongs and Qiu were participants in a joint venture to develop and sell residences on both the subject and adjacent properties. We address and reject that theory when we consider below whether Qiu is a "builder." Finally, Lovell argues that even if, in general, the seller of a single new residence is not a "builder," the Fongs are "builders" because "Stanley Fong is a licensed real estate broker and Sofia Fong is a licensed real estate sales person" and "in selling the residence to Lovell they were acting as real estate brokers and agents." We also reject that argument. Lovell cites no authority for the proposition that a real estate professional who is a one-time seller of his or her own new residence should be treated differently, for purposes of section 911, than a person in any other occupation.

If section 911 had not been amended in 2003, there would be no question whether the Fongs were "builders," because section 911 included an "original seller," without qualification, in its definition of "builder." The Fongs were indisputably the original sellers of the residence constructed on the subject property. However, " '[w]e presume the Legislature intends to change the meaning of a law when it alters the statutory language . . . .' " (*State Comp. Ins. Fund v. Workers' Comp. Appeals Bd.* (2008) 44 Cal.4th 230, 244.) The 2003 amendment to section 911 altered the definition of "builder" significantly and we must determine if there is a triable issue of whether, at the time of sale, the Fongs were "in the business of selling residential units to the public for the property that is the subject of the homeowner's claim" or were "in the business of building, developing, or constructing residential units for public purchase for the property that is the subject of the homeowner's claim."

Lovell maintains that one is "in the business," for the purposes of section 911, if one builds "for sale and profit." The Fongs maintain that they are not "in the business" because they have only constructed and sold a single home. We find no prior cases that address what the Legislature intended to convey in section 911 by specifying that a "builder" must be "in the business."

When interpreting statutory language, "[w]e begin with the fundamental rule that our primary task is to determine the lawmakers' intent." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 (*Delaney*).) " ' "We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." ' " (*Regents of University of California v. Superior Court* (2013) 222 Cal.App.4th 383, 397, quoting *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) We may also "turn to secondary rules of interpretation, such as maxims of construction . . . ." (*Katz v. Los Gatos-Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 55.)

As a first step, we conclude that "in the business," as used in the statute, is ambiguous. "Business" can refer to "a commercial transaction" or to "a particular occupation or employment habitually engaged in for livelihood or gain." (Black's Law Dict. (8th ed. 2004) p. 211.) Lovell's position is supported by regarding "in the business" to mean "engaging in a commercial transaction," but the Fongs position is supported by regarding "in the business" to mean "habitually engaging" in the type of transaction at issue.

In the next step of statutory construction, we look to legislative history. However, we have examined the legislative history of Assembly Bill No. 903 (2003-2004 Reg. Sess.) and found nothing in committee reports or other legislative materials that offers insight into the Legislature's intent in the use of the words "in the business." But the amendment made in 2003 is significant; it *narrows* the definition of "builder"—perhaps back to *Del Mar* and *Oliver*, which the Legislature has never expressly said it intended to overrule, as it did with *Aas*.

11

We also consider rules of statutory interpretation. "As a general rule, '[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules.' " (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297; see also § 5 ["The provisions of this Code, so far as they are substantially the same as existing statutes or the common law, must be construed as continuations thereof, and not as new enactments"].) As we have noted, under the common law, a one-time seller of a single new residence is not regarded as being "in the business" of selling new residences and is not subject to strict liability.[10] We also presume that the Legislature, in using the term "in the business," was aware of the meaning of that term as used in case law. (*People v. Moncada* (2012) 210 Cal.App.4th 1124, 1130-1131.)

When the Legislature narrowed the definition of "builder" in 2003, it used the words "in the business," which in case law, such as *Del Mar* and *Oliver*, dealing with the same subject matter as the Act, excluded occasional sellers of new residential property. We find nothing that would overcome the presumption that the Legislature was aware of this meaning. The cases that Lovell cites to support her interpretation of "in the

---

[10] In *Liberty Mutual Insurance Co. v. Brookfield Crystal Cove LLC* (2013) 219 Cal.App.4th 98, 101 (review den. Dec. 11, 2013, S213718), the court held that the Act provided a remedy when construction defects had not yet caused property damage, but that if property damage had occurred, common law causes of action were preserved. In her reply brief, Lovell argues that *Liberty Mutual* "bars importation of requirements for common law actions to the special statutory remedy." *Liberty Mutual* does not address section 911. We find nothing in that decision that supports Lovell's argument. Indeed, if *Liberty Mutual* is correct, then Lovell's interpretation of "in the business" would lead to an anomaly: a seller such as the Fongs would be strictly liable under the Act until property damage occurs, after which the seller, under common law, would no longer be strictly liable. We need not determine whether *Liberty Mutual* was correctly decided but note that it may be inconsistent with section 943, subdivision (a). (See also *Burch v. Superior Court* (2014) 223 Cal.App.4th 1411, 1417-1418 [relying on *Liberty Mutual*, but not exploring the tension between *Liberty Mutual* and the statutory language].)

12

business" were not decided under section 911 and are not contrary to the Fongs' interpretation.[11]

Further, Lovell's attempt to impose strict liability on the Fongs is inconsistent with the goal of a strict liability regime to spread the risk of loss among all who use the product. (*Nelson v. Superior Court* (2006) 144 Cal.App.4th 689, 696.) When a commercial activity is isolated, random, or accidental, there is no pool of "users" among whom the risk of loss may be shared. The *Oliver* court made it clear that this was one of the reasons why strict liability for residential construction defects was not extended to the occasional builder.

*Vaerst v. Tanzman* (1990) 222 Cal.App.3d 1535 (*Vaerst*), cited by the Fongs, demonstrates the connection between the policy served by a strict liability regime and consideration of whether one is "in the business" of the activity at issue. In 1985, the California Supreme Court held that "a landlord engaged *in the business* of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises

---

[11] Lovell first cites *Hopp v. City of Los Angeles* (2010) 183 Cal.App.4th 713. In *Hopp*, a municipal ordinance required a police permit for persons in " 'the business of buying, selling, exchanging or otherwise dealing in secondhand books.' " (*Id*. at p. 716.) Hopp was a book collector who did not resell his acquisitions, but might " 'recycle and/or donate' unwanted items." (*Ibid*.) The court concluded that "[t]he ordinance is directed at persons who engage in a commercial activity—both buying and selling—with a view to profit. Someone who simply collects books for personal enjoyment is not a 'secondhand book dealer.' " (*Ibid*.)

Lovell also cites *Siders v. Schloo* (1987) 188 Cal.App.3d 1217. In *Siders*, the defendants had purchased land, engaged a contractor to build a home, and then moved into the residence. (*Id*. at p. 1219.) Shortly after moving in, the defendants sold the home to the plaintiffs because of a job transfer to a new location. (*Ibid*.) The plaintiffs subsequently sued for breach of implied warranty. (*Id*. at p. 1220.) Although the court recognized the common law rule that sellers of new construction were subject to the implied warranty that such structures had been designed and built in a reasonably workmanlike manner, the court held that "[t]he public policy considerations which justified extension of implied warranty concepts to sales of new construction by commercial developers did not warrant application of implied warranty concepts to this case," in which it found that the defendants "were owner builders of their personal residence and not in the business of building new homes for sale." (*Id*. at p. 1221.)

13

when the defect existed at the time the premises were let to the tenant." (*Becker v. IRM Corp.* (1985) 38 Cal.3d 454, 464 (*Becker*), overruled by *Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1188, italics added.)[12]  In *Vaerst*, the defendant had leased his home and a guest of the tenants was injured on a portion of a stairway that had no handrail.  (*Vaerst*, at pp. 1537-1538.)  The *Vaerst* court rejected the plaintiff's strict liability claim under *Becker*, in part, because the defendant, "who leased his own family residence to the tenants on a temporary basis, was not 'engaged *in the business* of distributing goods to the public' as 'an integral part of the overall producing and marketing enterprise.'  [Citations.]  Rather, his act of leasing the family residence constituted an isolated transaction to which strict tort liability is inapplicable both as a matter of law and legal policy.  [Citation.]  It has been repeatedly held that liability without fault applies only to mass producers or mass lessors who play more than a random or accidental role in the overall marketing enterprise.  [Citations.]  . . .  [A] lessor . . . who rents his own house is not within the purview of *Becker* because he is not an entrepreneur placing his product in the chain of commerce."  (*Vaerst*, at p. 1540, italics added.)

We conclude that a one-time seller of a newly constructed residence, such as the Fongs, is not "in the business" of selling new residences and therefore not a "builder" under section 911.  That conclusion avoids conflict between the Act and common law and is in accord with the goals served by the imposition of strict liability.

In support of their motion for summary judgment, the Fongs established a prima facie showing that they are not in the business of selling new residences, and thus not "builders," because the subject property was the only new residential property they had ever sold, they had no plans to build and sell another residence, and they earned their livelihoods in other occupations.

Lovell presented no evidence that the Fongs were "builders," under section 911, and we conclude that there was no triable issue of that material fact.

---

[12]  Although *Becker* is no longer good law, what is of interest to us is how the *Vaerst* court understood what *Becker* meant by being "in the business."

14

**B. *Qiu was not a "Builder"***

Qiu stated in his declaration: "I acted as the general contractor during the construction of a single family residence located at 1836 Weir Drive, Hayward, California which is the subject property of this lawsuit." He further stated: "I never had ownership interest in the subject property, never acted as a general partner or any other kind of partner, and only received payment for my services as general contractor."[13]

Qiu's statements constitute a prima facie showing that he is not a "builder" of the subject property because he is excluded by section 911, subdivision (b). However, Lovell maintains that she presented evidence that the Fongs and Qiu actually conducted a joint venture, with the object of developing and selling properties at both the subject property and the adjacent property.[14]

Lovell presented evidence that the Fongs and Qiu had some relationship of cooperative effort because the Fongs financed Qiu's purchase of the adjacent property, Sofia assisted Qiu in obtaining a construction loan, the same architect and engineer were employed for both properties, and a single insurance policy was obtained to cover the construction at both lots. All of this points to cooperation, but not to " 'the strict relation of joint adventurers.' " (*Boyd v. Bevilacqua* (1966) 247 Cal.App.2d 272, 285.) None of this evidence establishes any right of the Fongs to control construction on, or the sale of, the adjacent property, or of Qiu to control the sale of the subject property. The deeds to

---

[13] Lovell objected to, and moved to strike, Qiu's declaration on the ground that it was conclusory and incompetent. The trial court overruled Lovell's objection because Lovell had "not shown that the facts contained in Qiu's declaration were not based on his personal knowledge." Lovell argues here that "[t]he law is plain that conclusionary statements on legal questions cannot be the basis of a summary judgment." We reject Lovell's characterization of Qiu's statements as conclusory and have no reason to believe that Qiu was incompetent to describe his role in a construction project, given his profession as a contractor. We discern no abuse of discretion by the court in overruling Lovell's objection.

[14] Lovell states that she presented evidence "demonstrating a joint venture/partner relation between Fong and Qiu." However, Lovell's argument is limited to the existence of a joint venture. Because Lovell does not argue the existence of a business partnership, we do not address that question.

15

both properties were held separately, as were the construction loans. The evidence shows no involvement, or right of involvement, by Qiu in the sale of the subject property to Lovell (beyond Qiu's provision of a warranty, when requested). None of the evidence established that profits realized from the sale of the two properties were shared in any way.

"A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. [Citations.] The existence of a joint venture depends upon the intention of the parties. [Citations.] . . . 'Whether the parties to a particular contract have thereby created, as between themselves, the strict relation of joint adventurers or some other relation involving cooperative effort, depends upon their actual intention, which is determined in accordance with the ordinary rules governing the interpretation and construction of contracts.' " (*Boyd v. Bevilacqua*, *supra*, 247 Cal.App.2d at p. 285.) " 'There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership interest in the enterprise.' [Citation.] A joint venture may be formed by parol agreement or may be assumed as a reasonable deduction from the acts and declarations of the parties." (*Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 91.)

Because Qiu presented evidence that his only role with respect to the subject property was as a contractor and Lovell failed to present evidence that whatever cooperative agreement existed between the Fongs and Qiu had all three basic elements of a joint venture, we conclude that there was no triable issue regarding whether the Fongs and Qiu were participants in a joint venture. Accordingly there was no triable issue regarding whether Qiu was a "builder" as defined by section 911.

IV. *Lovell Failed to Plead a Negligence Claim*

In opposition to Qiu's motion for summary judgment, Lovell argued, as she also argues here, that even if Qiu were not a builder, he would still be liable to her, under section 936, for violations of the construction standards in the Act that were due to his

16

negligence.[15]  The trial court addressed that argument as follows:  "[Lovell] also argues that Qiu nonetheless may be held liable for negligence as a general contractor pursuant to Civil Code section 936, regardless of whether he is a 'builder' within the meaning of Civil Code section 911.  But the only theory of liability asserted in the complaint is that Qiu is liable for construction defects as a 'builder.' "

In reviewing the propriety of granting a motion for summary judgment or summary adjudication, the first step is to "identify the issues framed by the pleadings since it is these allegations to which the motion must respond . . . ."  (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064.)  Lovell maintains that non-builder contractor liability based on negligence was placed at issue by the allegations in her first cause of action.  We disagree.

"A party cannot generally defeat a summary judgment by pointing to a theory of liability or defense that has no basis in the pleadings.  '[T]he pleadings set the boundaries of the issues to be resolved at summary judgment.  [Citations.]  A "plaintiff cannot bring up new, unpleaded issues in his or her opposing papers.  [Citation.]"  [Citations.]  A summary judgment or summary adjudication motion that is otherwise sufficient "cannot be successfully resisted by counterdeclarations which create immaterial factual conflicts outside the scope of the pleadings; counterdeclarations are no substitute for amended pleadings."  [Citation.]' "  (*Dang v. Smith* (2010) 190 Cal.App.4th 646, 664.)

Here, the essential allegations made in Lovell's first cause of action were that the Fongs and Qiu were "builders" and that the residence sold to her had structural defects.  These allegations support strict liability as "builders" under the Act as a theory of recovery.  However, even though the negligence of a non-builder contractor may also bring the Act into play, that theory of recovery would require an allegation of negligence.  There is none, so Lovell's contention that Qiu might be liable to her under a negligence theory does not raise a triable issue of fact.

---

[15]  On appeal, Lovell also contends that the Fongs are jointly liable for any negligence on Qiu's part.  Because we conclude that Qiu's alleged negligence presents no issue framed by the pleadings, neither does any joint liability of the Fongs.

## V. *The Cause of Action for Breach of Express Warranty*

Lovell's second cause of action, for breach of express warranty, identified Qiu's letter of June 6, 2005, as the warranty that she alleged Qiu had breached. Qiu presented evidence in his motion for summary judgment that notice of breach of that warranty was not provided to him until after the warranty had expired. In her opposition to Qiu's motion, Lovell abandoned her allegations concerning the June 6, 2005 letter and instead argued that the document titled "New Building Structural Warranty" was the actual operative warranty.

The trial court addressed this issue as follows: "The court rejects [Lovell's] argument that the five-year express warranty given to her by Qiu on June 6, 2005, was not the actual warranty, and that the parties executed a different express warranty on July 11, 2005, which provides for a ten-year enforcement period and by which Qiu is actually bound. The only warranty sued upon was the five-year warranty. [Citations.] Because [Lovell] did not present any other evidence that raises a triable issue of fact as to breach of express warranty, Qiu is entitled to judgment as a matter of law on this cause of action."

As with Lovell's negligence theory, the issue of whether Qiu was liable for breach of an express warranty different from that identified in Lovell's complaint was not a question of fact framed by the pleadings. Thus, Lovell did not raise a triable issue of fact with her evidence concerning a different warranty.

## VI *Permission to Amend the Complaint*

Finally, Lovell contends that she should have been allowed to amend her complaint to allege negligence by Qiu and to identify the actual express warranty that she alleges Qiu had breached. It is far too late.

"If a party seeks to avoid summary judgment by going outside the pleadings, it is incumbent upon him to *move to amend* in a timely fashion." (*Dang v. Smith*, *supra*, 190 Cal.App.4th at p. 664.) Nothing in the record before us shows that Lovell ever sought leave to amend her complaint. Even when it became clear, during the hearing on the summary judgment motions, that the court rejected some of Lovell's arguments because

18

they involved issues that were not within the scope of her complaint, Lovell did not request leave to amend.

Following the hearing, the Fongs and Qiu submitted separate proposed judgments and Lovell filed objections to the proposed judgments. As part of her objections, Lovell stated that the judgment should "give [Lovell] an opportunity prior to entry, to amend her complaint to state her claims for contractor negligence and breach of the 6/13/05 written warranty." Raising an objection to a proposed judgment is not equivalent to moving for leave to amend the complaint. Lovell never moved to amend and we have no reason to believe that it would have been futile for her to do so when she filed her oppositions or perhaps even by the time of argument on the motions.

It is true, as Lovell argues, that "if summary judgment is granted on the ground that the complaint is legally insufficient, but it appears from the materials submitted in opposition to the motion that the plaintiff could state a cause of action, the trial court should give the plaintiff an opportunity to amend the complaint before entry of judgment." (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1663.) But the record does not show that the court denied Lovell such an opportunity. What the record shows is that Lovell never availed herself of ample opportunity to seek leave to amend.

19

## DISPOSITION

The judgment is affirmed.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Haerle, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.